John JACKSON, Yvonne Jackson, Gregory M. Barrow and Timsey Barrow, Petitioners–Appellants, Cross–Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee, Cross–Appellant.

Nos. 87–1173, 87–1183, 87–1180, 87–1184, 87–1178 and 87–1185.

United States Court of Appeals, Tenth Circuit.

Jan. 10, 1989.

---

R. La Mar Bishop, Salt Lake City, Utah, for petitioners-appellants and cross-appellees.

Elaine F. Ferris (Michael L. Paup, Chief, Jonathan S. Cohen, Atty., Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., and Michael C. Durney, Acting Asst. Atty. Gen., on the brief), Atty., Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee, and cross-appellant.

Before MOORE, BARRETT, and TACHA, Circuit Judges.

TACHA, Circuit Judge.

This is an appeal from a United States Tax Court decision upholding the disallowance of the taxpayers' deductions in 1978 for lease amortization and advertising expenses under I.R.C. § 162 and the imposition of penalties under I.R.C. § 6651 for one of the taxpayer's failure to file timely returns in the 1978, 1979, and 1980 tax years. We affirm.

Taxpayers Barrow and Jackson (hereinafter referred to jointly as "taxpayers")[1] were involved in a business venture to manufacture, distribute, and sell a device known as the "Norris XLP," capable of playing and recording twenty-four hours of material on a single audio cassette. During the latter part of 1978, taxpayers negotiated with the inventor to obtain an exclusive license for the manufacture, sale, and distribution of the Norris XLP. Taxpayers obtained an informal agreement on October 13, 1978, and began to take preparatory steps to manufacture and distribute the product, including commissioning a marketing study and seeking a manufacturer.

1. Timsey Barrow and Yvonne Jackson are parties to this action solely because they filed joint federal income tax returns with their husbands. For this reason all references to taxpayers shall mean Gregory M. Barrow and John Jackson.

In November 1978 taxpayers left their previous occupation as insurance agents to devote more time to the venture. About November 1, 1978, taxpayers formed a corporation, Norwood Industries, Inc. (Norwood), to serve as the primary licensee. Taxpayers planned to utilize Norwood to sell territorial sublicenses that would convey to the sublicensee the exclusive right to sell the device in a defined geographic region. At about the time Norwood was formed, taxpayers also formed a partnership, J & G Distributing (J & G), for the purposes of acquiring and reselling territorial sublicenses and distributing the device under its own territorial sublicenses. Taxpayers were equal partners in J & G, and equal shareholders in Norwood, during 1978.

A formal license agreement was executed between the inventor and Norwood on December 13, 1978. Taxpayers each acquired, individually, two territorial sublicenses from Norwood, and their partnership, J & G, also acquired sublicenses that it kept to develop for product distribution. J & G also sold territorial sublicenses for Norwood on a commission basis, earning $170,000 in commissions during 1978. As a condition of the sublicense agreement, each sublicensee was required to participate in a cooperative advertising program with Norwood. Taxpayers and J & G contributed to this program in 1978.

The parties have stipulated that "[i]n November and December 1978, Norwood and its licensee's [sic] contacted agents, distributors, and retail outlets in an effort to sell the new machines," and that "[o]rders were taken and the first units were sold in December 1978 and January of 1979." The only documentary evidence of a sale in 1978, however, is a shipping order for one player/recorder by Norwood to an individual in Chino, California.[2] The inventor, Norris, received the first shipment of player/recorders from the factory in Hong Kong on December 30, 1978. Norris delivered these player/recorders to Norwood during the first two days of 1979.

Taxpayers took deductions for their contributions to the cooperative advertising program, and for license amortization. The tax court disallowed taxpayers' 1978 deductions on the ground that during that year neither of the taxpayers, nor their partnership J & G, was engaged in the trade or business of distributing player/recorders pursuant to their sublicenses. *Jackson v. Commissioner*, 86 T.C. 492, 514, 517 (1986).

The tax court found that taxpayers, acting in their capacity as sublicensees, neither "made ... sales during 1978, nor ... made any legitimate efforts to locate potential buyers for the [player/recorders]." *Id.* at 515. "The only activities that [taxpayers] undertook in regard to their individual sublicenses in 1978 was the purchase of the sublicense from Norwood and the initial payment under the advertising cooperative agreement." *Id.* Furthermore, the court concluded that "[m]erely acquiring a license to distribute a product within a territory does not place a taxpayer in the trade or business of distributing that product." *Id.*

Regarding J & G, the tax court found that "[a]ll of the gross income of J & G for 1978 was from the sale of Norwood sublicenses and none from the sale of Norwood products." *Id.* at 516. Although "J&G was clearly in the business of selling Norwood sublicenses during 1978," the tax court found that "[taxpayers] took no significant action to commence sales of Norwood products by J&G," "[n]o sales of Norwood products were, in fact, made by J & G during 1978," and "there is no indication that J & G purchased any inventory" in 1978. *Id.* at 516–17. On the basis of these findings, the tax court held that J & G was not in the trade or business of distributing Norwood products during 1978. *Id.* at 517.

The tax court held that taxpayers' advertising expenditures were not deductible un-

---

**2.** Other shipping orders to individuals in Quebec and Nevada are dated "1/7/78" and "1–8–78" respectively. These dates are plainly erroneous as to the year, however, because the venture was not even formed in January of 1978.

der I.R.C. § 162,[3] but were required to be capitalized as "preopening expenses." *Jackson*, 86 T.C. at 516–17. The court similarly held that taxpayers could not deduct the 1978 amortization of their sublicenses because they were not carrying on the trade or business of selling player/recorders under those sublicenses.[4] *Id.*

## I.

Taxpayers contend that the tax court erred in holding that neither taxpayers, nor J & G, were carrying on the trade or business of distributing player/recorders in 1978. Alternatively, they contend that the tax court erred in separating the business activities of J & G and prohibiting taxpayers from offsetting the advertising and amortization expenses incurred by J & G for the sale of player/recorders against J & G's commission income from the sale of territorial sublicenses. We consider these issues in turn.

## A.

"Congress directed the United States Courts of Appeals to review tax court decisions 'in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury.'" *Love Box Co. v. Commissioner*, 842 F.2d 1213, 1215 (10th Cir.) (quoting I.R.C. § 7482), *cert. denied*, —— U.S. ——, 109 S.Ct. 62, 102 L.Ed.2d 40 (1988). The Supreme Court has stated that to "determine whether the activities of a taxpayer are 'carrying on a business' requires an examination of the facts in each case." *Higgins v. Commissioner*, 312 U.S. 212, 217, 61 S.Ct. 475, 478, 85 L.Ed. 783 (1941). This case, however, presents a mixed question of law and fact because we must apply the statutory standard of I.R.C. § 162 to determine whether taxpayers have incurred expenses "during the taxable year in carrying on any trade or business." "The Supreme Court has defined mixed questions as those 'in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.'" *Love Box Co.*, 842 F.2d at 1215 n. 2 (quoting *Pullman–Standard v. Swint*, 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1790 n. 19, 72 L.Ed.2d 66 (1982)). In this case we review the tax court's factual findings, including reasonable inferences that may be drawn therefrom, under the clearly erroneous standard, *Commissioner v. Duberstein*, 363 U.S. 278, 290–91, 80 S.Ct. 1190, 1199–2000, 4 L.Ed.2d 1218 (1960), but review de novo the application of the law to those facts, *see Colorado Springs Nat'l Bank v. United States*, 505 F.2d 1185, 1189 (10th Cir.1974).

Taxpayers contend that the trial court erred in finding that taxpayers, in their capacities as sublicensees or as part-

---

**3.** I.R.C. § 162(a) provides in relevant part that "[t]here shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."

**4.** The tax court held, and the parties do not dispute, that the territorial sublicenses granted by Norwood to taxpayers and J & G come within the definition of a franchise in I.R.C. § 1253(b)(1). *Jackson*, 86 T.C. at 511. Section 1253(d) determines the deductibility of payments made by the transferee of a franchise, such as the taxpayers in this case. Section 1253(d)(1) provides in relevant part that amounts paid by franchisees which are "contingent on the productivity, use, or disposition of the franchise ... shall be allowed as a deduction under section 162(a)." Thus, a taxpayer may deduct the entire amount of contingent payments in the year the payment is made, subject to the requirement grafted in from § 162(a) that the taxpayer is "carrying on a trade or business" relating to that franchise in that tax year.

Section 1253(d)(2) applies to noncontingent payments such as those required of the taxpayers in this case. Section 1253(d)(2) requires amortization of such payments over a specified period, rather than deduction of the entire amount when paid. Section 1253(d)(2) fails to make specific reference to § 162(a). Nevertheless, we agree with the tax court that § 1253(d)(2) also embodies a trade or business requirement. *See Herrick v. Commissioner*, 85 T.C. 237, 264–66 (1985).

Here, the tax court also considered whether "payment" under § 1253 requires an actual cash payment or whether a nonrecourse note is sufficient. In light of our disposition of this case, we need not reach this issue.

ners in J & G, made no sales and made insufficient efforts to locate buyers for the player/recorders during 1978. *Jackson,* 86 T.C. at 515, 517.[5] This finding has ample support in the record and is not clearly erroneous.

As the tax court stated, taxpayers "wore many hats" in 1978 as they attempted to turn the player/recorder device into a profitable venture. *Id.* at 514. They acted as officers, directors, and shareholders of Norwood, as well as partners of J & G, and individual sublicensees. Although the parties have stipulated that "[i]n November and December of 1978, Norwood and its licensee's [sic] contacted agents, distributors and retail outlets in an effort to sell the new machines," and that "[o]rders were taken and the first units were sold in December of 1978 and January of 1979," the only documentary evidence of a sale in 1978 is a shipping order on a Norwood form showing a sale of a single player/recorder to an individual in Chino, California. Barrow's own testimony shows that Norwood, rather than a licensee, made that sale. If taxpayers participated in that sale, they did so on behalf of Norwood, not as individual sublicensees or as partners in J & G.

Barrow further testified that if the territory in which Chino, California was located belonged to a sublicensee, the sale would be credited to that sublicensee. Nothing in the record shows that licenses held by Jackson, Barrow, or J & G covered that territory. The record therefore supports the tax court's findings that no sales were made by taxpayers in their capacities as licensees or as partners in J & G.

■ Taxpayers point to the stipulation that "Norwood and its licensee's [sic]"

made an effort to sell machines in November and December 1978 to show that taxpayers actively promoted the sale of player/recorders in 1978. The stipulation, however, does not specify that taxpayers were participants. The tax court's finding that taxpayers, acting in their capacities as licensees or as partners in J & G did not promote the sale of player/recorders in 1978 is supported by the record and is not inconsistent with this stipulation. Although there is evidence that taxpayers promoted the product in subsequent years, the record is void of evidence to support a conclusion contrary to that reached by the tax court.[6]

■ On the basis of these facts, the tax court concluded that taxpayers were not "carrying on a trade or business" during 1978. We agree. "[T]he general test for whether a person is engaged in a 'trade or business' under section 162 has variously been stated to be 'whether the business was undertaken "in good faith for the purpose of making a profit," ' or whether the taxpayer's *primary* purpose and intention in engaging in the activity is to make a profit." *Snyder v. United States,* 674 F.2d 1359, 1362 (10th Cir.1982) (emphasis in original) (citation omitted) (quoting *Malmstedt v. Commissioner,* 578 F.2d 520, 527 (4th Cir.1978)). The issue in this case, however, involves the temporal determination of when the requisite activities began; the Government does not dispute the good faith or profit motive of taxpayers. The test for when, at a point in time, a trade or business begins, is well settled:

even though a taxpayer has made a firm decision to enter into business and over a considerable period of time spent money in preparation for entering that business, he still has not "engaged in carrying on

---

5. Taxpayers also argue that the tax court erred in finding that J & G had no inventory in 1978. We need not consider this claim in light of the Tax Court's conclusion that they made no effort to locate buyers for their product.

6. Taxpayers also point to Barrow's testimony that "I've involved myself in advertising and promotion and hiring salesmen and bringing dealers into the company to work for me and sell the product" during the period from October 1978 to the time of trial. There is no record

of advertising in 1978 by either of the taxpayers outside of the cooperative advertising program with Norwood. Furthermore, even if Barrow did hire salesmen and bring in dealers during 1978, this testimony can be construed as hiring on behalf of Norwood. Alternatively, even if Barrow was hiring for his own territory, this activity still can be viewed as preparatory activity that is insufficient to rise to the level of promoting the sale of the actual product.

any trade or business" within the intendment of section 162(a) until such time as the business has *begun to function as a going concern and performed those activities for which it was organized.*

*Richmond Television Corp. v. United States*, 345 F.2d 901, 907 (4th Cir.) (emphasis added), *vacated and remanded on other grounds*, 382 U.S. 68, 86 S.Ct. 233, 15 L.Ed.2d 143 (1965) (per curiam), *original holding on this issue reaff'd*, 354 F.2d 410, 411 (4th Cir.1965), *overruled on other grounds, NCNB Corp. v. United States*, 684 F.2d 285, 289 (4th Cir.1982).

■ Taxpayers' activities in this case clearly did not rise to the level of a functioning business, and taxpayers did not perform the ultimate activity for which their business was organized—attempting to sell player/recorders. Although the failure to make sales in a given period does not per se prevent a taxpayer from carrying on a business,[7] the tax court's finding that taxpayers "made [no] legitimate efforts to locate potential buyers for the [player/recorders]" during 1978, *Jackson*, 86 T.C. at 515, is fatal to taxpayers' case. Merely possessing the legal capability to sell player/recorders by obtaining a license from the inventor, without actual efforts to sell the products, is insufficient to constitute carrying on a trade or business for purposes of section 162.[8] *See Kennedy v.*

*Commissioner*, 32 T.C.M. (CCH) 52, 55 (1973).

## B.

Even if J & G was not carrying on the business of selling player/recorders in 1978, taxpayers alternatively contend that they are entitled to advertising and license amortization deductions attributable to J & G because J & G was "clearly in the business of selling Norwood sublicenses during 1978," *Jackson*, 86 T.C. at 516. Taxpayers contend that the tax court erred in separating J & G's activities into two categories—selling licenses, and selling products—for the purposes of determining whether expenses attributable to such activities are deductible under section 162. We disagree.

■ The Supreme Court has stated that there is a "notion of proximate result implicit in the statutory words 'expenses paid or incurred ... in carrying on any trade or business.'" *Deputy v. du Pont*, 308 U.S. 488, 494, 60 S.Ct. 363, 367, 84 L.Ed. 416 (1940) (quoting former version of section 162). In other words, unless such expenses arise out of activities that are part of a trade or business, deduction under section 162 is not available. *See id.*

■ For example, an individual taxpayer must distinguish between those expenses incurred in connection with the conduct of his own trade or business, and those ex-

---

7. For example, this court has rejected the proposition that an author cannot be in the trade or business of writing if he has not yet produced a book. *Snyder v. United States*, 674 F.2d 1359, 1363 (10th Cir.1982). In that case, we remanded the claim of an attorney who had compiled a book of photographs, but had made no apparent sales of his work, for the trial court to make detailed factual findings as to whether he was carrying on a trade or business with regard to that book. *Id.* at 1365. The fact that "[a] business need not yield an immediate profit," *id.* at 1363, indicates that, similarly, a business need not generate immediate sales.

Justice Frankfurter has articulated the following test, which is useful in illustrating this point: " 'carrying on any trade or business,' within the contemplation of [section] 162, involves holding one's self out to others as engaged in the selling of goods or services." *Deputy v. du Pont*, 308 U.S. 488, 499, 60 S.Ct. 363, 369, 84 L.Ed. 416 (1940) (Frankfurter, J., concurring). The tax court has applied this test, in conjunction with

the test of *Richmond Television*, in *Kennedy v. Commissioner*, 32 T.C.M. (CCH) 52 (1973). The court in that case denied the taxpayer's deductions for expenses incurred prior to opening his retail pharmacy, holding that such expenses must be capitalized as preopening expenses. *Id.* at 55. The pharmacy did not begin to function as a going concern "until the date it first opened its doors to the public." *Id.* Although sales presumably followed, this holding properly focused on the taxpayer's "opening its doors" to attempt to make a sale, and not on the taxpayer's success at selling.

8. Although advertising that offers specific products for sale, rather than generally promoting the opening of a new business, could be viewed as promoting the sale of a product, the mere payment of the cooperative advertising costs in this case is not sufficient to make the business "[begin] to function as a going concern" as required by *Richmond Television*.

penses he incurs on behalf of the corporation of which he is an officer or investor. *See du Pont,* 308 U.S. at 494, 60 S.Ct. at 366–67; *Wiles v. United States,* 312 F.2d 574, 576–77 (10th Cir.1962). Similarly, the advertising and license amortization expenses incurred in this case clearly do not arise out of taxpayers' business activity of selling Norwood sublicenses for a commission. Selling sublicenses involves a significantly different product than selling player/recorders, and the tax court did not err in separating J & G's business activities for the purpose of applying section 162.

## II.

 Barrow also contests the imposition of penalties under I.R.C. § 6651 for his failure to file timely returns in 1978, 1979, and 1980. In order to avoid the imposition of penalties under this section, the taxpayer must prove both (1) that the failure to file was "due to reasonable cause," and (2) that the failure did not result from "willful neglect." *United States v. Boyle,* 469 U.S. 241, 245, 105 S.Ct. 687, 690, 83 L.Ed.2d 622 (1985) (quoting I.R.C. § 6651(a)(1)). Barrow contends that the tax court erred in holding that his reliance on his accountant's advice was not reasonable cause. *Jackson,* 86 T.C. at 538. The advice of Barrow's accountant was essentially that Barrow would owe no tax because of the losses he had incurred thus far in the venture, and therefore he would face no penalty for failing to file a timely return.[9]

The Supreme Court has stated that "[w]hether the elements that constitute 'reasonable cause' are *present* in a given situation is a question of fact, but what elements *must* be present to constitute 'reasonable cause' is a question of law." *Boyle,* 469 U.S. at 249 n. 8, 105 S.Ct. at 692 n. 8. The facts concerning Barrow's reliance on his accountant are not in dispute, and therefore we review de novo the tax court's determination.

"Courts have frequently held that 'reasonable cause' is established when a tax-

payer shows that he reasonably relied on the advice of an accountant or an attorney that it was unnecessary to file a return, even when such advice turned out to have been mistaken." *Id.* at 250, 105 S.Ct. at 692. The rationale behind this rule is that it is reasonable for the taxpayer to rely on the substantive advice of the professional. *Id.* at 251, 105 S.Ct. at 692–93. Requiring the taxpayer to confirm independently that advice would "nullify the very purpose of seeking the advice of a presumed expert in the first place." *Id.* Reliance on the substantive advice of an accountant or attorney is consistent with the "ordinary business care and prudence" required by the regulations. *Id.;* Treas.Reg. § 301.6651–1 (c)(1) (as amended in 1973).

"By contrast, one does not have to be a tax expert to know that tax returns have fixed filing dates and that taxes must be paid when they are due." *Boyle,* 469 U.S. at 251, 105 S.Ct. at 693. Although a taxpayer who has relied upon an expert's advice that he is not legally obligated to file a return may have satisfied the "reasonable cause" requirement, reliance upon an expert is not reasonable in a situation in which the taxpayer is advised that a return is due but that the taxpayer need not comply with the law because no penalty will occur. We hold as a matter of law that the taxpayer in this case has not exercised the "ordinary business care and prudence in providing for payment of his tax liability" necessary to constitute "reasonable cause." Treas.Reg. § 301.6651–1(c)(1) (as amended in 1973).

As demonstrated by this case, a presumed expert's advice concerning the amount of tax owed can be erroneous, and the taxpayer must bear the risk of that error when he fails to comply with a known duty to file a return. As the Supreme Court has noted, "our system of self-assessment in the initial calculation of a tax simply cannot work on any basis other than one of strict filing standards." *Boyle,* 469 U.S. at 249, 105 S.Ct. at 691. We do not

---

**9.** Section 6651(a)(1) imposes a penalty of five percent of the tax due for each month or fraction thereof that a return is delinquent, up to a maximum of twenty-five percent. Thus, if no tax is due, no penalty will be assessed under this section.

believe Congress intended for the penalty provisions supporting that self-assessment system to be circumvented by the mere reliance on an expert's opinion that no tax is due.

Barrow further argues that his absence from the country on business trips to Hong Kong to monitor the manufacture of the player/recorders made him unable to complete the returns on time. The tax court found that Barrow was not out of the country on any of the filing dates in question and rejected the conclusion that this was reasonable cause for the delay. *Jackson*, 86 T.C. at 539. The tax court's finding regarding Barrow's absence and his inability to file returns is not clearly erroneous, and we agree that Barrow failed to show reasonable cause. Because of our disposition of the reasonable cause issue, we need not reach whether Barrow's failure to file timely returns also constitutes "willful neglect."

The decision of the United States Tax Court is therefore AFFIRMED.