GARY E. KRAUSE, TAX MATTERS PARTNER, BARTON
ENHANCED OIL PRODUCTION INCOME FUND, PETITIONER
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

R.A. HILDEBRAND AND DOROTHY A. HILDEBRAND WAHL,
PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 16425-86, 33231-86.     Filed May 11, 1989.

*Kenneth M. Barish* and *Jeffrey P. Berg,* for the petition-
ers.
*Stephen M. Miller, Marion S. Friedman,* and *Elizabeth
Girafalco Chirich,* for the respondent.

## OPINION

SWIFT, *Judge:* This matter is before the Court on the
parties' cross-motions for partial summary judgment filed
under Rule 121.[1] With one exception, the issues with
respect to which each party seeks summary judgment are
the same. Each party has filed an objection to the opposing
party's motion for partial summary judgment on the merits
of each of the issues raised therein, and each party objects
to the opposing party's motion for partial summary judg-

---

[1]Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and
Procedure, and all section references are to the Internal Revenue Code of 1954 as in effect
during the years in issue.

ment as to certain issues on the ground that disputed material facts exist that make summary disposition of these issues in favor of the opposing party premature.

These consolidated cases are test cases for investors who were denied loss deductions for the years 1980, 1981, 1982, and 1983, relating to limited partnerships that invested in oil and gas exploration and production using advanced oil and gas technology. The two particular limited partnerships that are involved in these test cases (namely, Technology Oil and Gas Associates 1980 and Barton Enhanced Oil Production Fund) were part of two groups of limited partnerships referred to in this opinion as the "Manhattan-1980 Partnerships" and the "Wichita-1982 Partnerships."

The parties' cross-motions for partial summary judgment raise the following primary issues: (1) Whether petitioners were personally liable within the meaning of section 465(b)(2)(A) with respect to their pro rata assumption of partnership debt obligations; (2) whether petitioners were protected against loss within the meaning of section 465(b)(4) with respect to partnership debt obligations; and (3) whether creditors associated with partnership debt obligations had continuing prohibited interests in the activity other than as creditors within the meaning of section 465(b)(3)(A).

Respondent's motion for partial summary judgment also raises an additional issue concerning the genuineness of the debt obligations of the partnerships. As we will explain, we regard that issue as not ripe for summary disposition, and respondent's motion as to that issue will be denied. In addressing the issues raised in these cross-motions for partial summary judgment and for purposes of these motions only, we have assumed that the debt obligations of the partnerships are genuine.

The parties agree that certain other issues present in this case (e.g., whether the partnerships were engaged in activities for profit and whether petitioners' purported investments were shams) are not ripe for summary judgment, and the resolution of these issues along with the issue as to the genuineness of the partnership debt obligations has been held in abeyance until the instant motions are decided.

Many of the facts relevant to these motions have been stipulated.

### Technology-1980

Petitioners Hildebrand and Wahl invested in one of the Manhattan-1980 Partnerships known as Technology Oil and Gas Associates 1980 (Technology-1980). The general partners of each of the Manhattan-1980 Partnerships were Richard B. Basile (Basile) and Glenda Exploration and Development Corp. (GEDC), a Texas corporation.

Technology-1980 was formed in 1980 under the uniform limited partnership law of Utah. The sale of 250 partnership units in Technology-1980 was authorized by the general partners, and 211.5 units were sold to 142 limited partners.

The subscription price for each full limited partnership unit in Technology-1980 was $230,000, payable by each limited partner to Technology-1980 as follows: (1) $10,000 in cash or check; (2) two recourse promissory notes, each in the amount of $10,000 with simple interest at 10 percent, due respectively on March 1, 1981, and March 2, 1982; (3) a recourse debt obligation in the amount of $120,000; and (4) a nonrecourse, non-interest-bearing debt obligation in the amount of $80,000, due on December 31, 2005.

The $120,000 recourse debt obligation associated with each limited partnership unit in Technology-1980 (item (3) above) was payable to Technology-1980 in four separate installments due on December 31, 1992, 1993, 1994, and 1995. The four installments were each in the amount of $30,000 and bore 7-percent nonrecourse simple interest. Neither the principal amount of the $120,000 debt obligation nor the four installments due with respect thereto were evidenced by promissory notes, but the obligation and the installments were agreed to in the partnership subscription agreements.

The investment objectives of Technology-1980 were: (1) To drill for and sell oil and gas located in the Monroe, Louisiana, gas field, as well as in other oil and gas fields (the drilling program); (2) to improve the economics of recovering oil from heavy oil properties by developing or using special drilling technology (the enhanced-oil-recovery program); and (3) to use a portion of the net cash-flow of

the limited partnership to acquire additional oil and gas properties over a 15-year period (the developmental-drilling program).

With regard to its drilling program, Technology-1980 entered into an agreement with Glenda Petroleum Corp. (GPC), an affiliate of GEDC. In 1980, GPC had approximately 5,000 acres under lease in the Monroe, Louisiana, gas field, on a portion of which approximately 300 commercially productive wells already were drilled. Under the agreement, Technology-1980 acquired from GPC working or operating interests in drilling sites in this same gas field in Monroe, Louisiana. The owner of a working interest generally has the right to develop and exploit oil and gas on the leased property and is responsible for the cost of development and operation of wells that are drilled on the property.

*Debt Obligations To TexOil*

In order to achieve its second investment objective (the enhanced-oil-recovery program), Technology-1980 allegedly acquired from TexOil International Corp. (TexOil) working interests in heavy oil properties and from Elektra Energy Corp. (Elektra) the right to use special equipment and new technology in the recovery of oil. Heavy oil properties may be defined as properties that contain deposits of viscous and high pour-point crude oil. Technology-1980 acquired working interests in approximately 700 acres of heavy oil properties in Utah and Wyoming.

For the working interests in the heavy oil properties, Technology-1980 agreed to pay TexOil minimum annual royalties in the amount of $5,000 per partnership unit. These minimum annual royalties were due each year for 20 years. Technology-1980 agreed to pay the minimum annual royalties partly in cash and partly by means of a series of recourse promissory notes. In each of the first 3 years, Technology-1980 was to pay the $5,000 in minimum annual royalties due with respect to each partnership unit with cash in the amount of $440 and with a promissory note in the amount of $4,560. After the third year, Technology-1980 was to pay TexOil the $5,000 in royalties due each year with respect to each partnership unit by giving TexOil a promissory note in that total amount, bearing simple

interest at a rate of either 9.9 or 12 percent. All of the promissory notes associated with the minimum annual royalties were 20- to 25-year notes, and with the exception noted below the entire principal and interest on the notes were not due until December 31, 2005.

The totals of all of the promissory notes executed by Technology-1980 during the years 1980 through 1985 in favor of TexOil in payment of minimum annual royalties with respect to all of the partnership units sold are summarized below:

| Date of notes | Principal amount of notes (211.5 units times $4,560 or $5,000) | Interest rate | Date due |
|---|---|---|---|
| Dec. 31, 1980 | $964,440 | 9% | Dec. 31, 2005 |
| Dec. 31, 1981 | 964,440 | 9 | Dec. 31, 2005 |
| Dec. 31, 1982 | 964,440 | 12 | Dec. 31, 2005 |
| Dec. 31, 1983 | [1]964,440 | 12 | Dec. 31, 2005 |
| Dec. 31, 1984 | [2]951,750 | 9 | Dec. 31, 2005 |
| Dec. 31, 1985 | [2]951,750 | 9 | Dec. 31, 2005 |

[1]Apparently, Technology-1980 also made a cash payment in the amount of $440 per partnership unit in 1983.
[2]Apparently, Technology-1980 also made a cash payment in 1984 and 1985, the amount of which is not reflected in the record.

If it had a net cash-flow in any year, Technology-1980 was required to make prepayments on the promissory notes relating to the minimum annual royalties. The amounts of the required prepayments ranged from 10 percent to 35 percent of the partnership's net cash-flow depending on various formulae set forth in the agreement with TexOil. Also, the promissory notes were to be prepaid only after Technology-1980 had fully paid certain debt obligations to Elektra which are described below.

In addition to the cash and promissory notes relating to the minimum annual royalties, Technology-1980 gave TexOil a 2-percent overriding royalty interest in the heavy oil properties. This 2-percent overriding royalty was based on gross production from the heavy oil properties. With the exception noted below, the overriding royalty was payable monthly and was not subordinate to indebtedness Technology-1980 owed other creditors. Technology-1980 was permitted, however, to offset the amount of the overriding

royalty actually paid each year against the total amounts due each year on the promissory notes relating to the minimum annual royalties. Technology-1980 gave TexOil a security interest in the heavy oil properties.

Technology-1980 could terminate its agreement with TexOil without cause on 30 days' written notice and it could terminate the agreement immediately if it was prevented from developing the heavy oil properties due to a Bureau of Land Management (BLM) Wilderness order or if the hydrocarbons under the heavy oil properties were classified as "tar sands" instead of oil deposits by the U.S. Department of Interior. If Technology-1980 terminates the agreement with TexOil, all of Technology-1980's debt obligations (including the recourse promissory notes) to TexOil are extinguished except for that portion of the debt obligations that has accrued prior to the termination.

### Debt Obligations to Elektra

As explained, in addition to acquiring working interests in heavy oil properties, Technology-1980 acquired from Elektra the right to use a portfolio of enhanced-oil-recovery (EOR) technology. These rights included the exclusive, nontransferable right and license to use existing EOR technology as well as additional EOR technology developed or acquired by Elektra during the term of Technology-1980's license agreement.

The license Technology-1980 acquired from Elektra was for a 5-year period beginning on the date the license agreement was executed. The license nominally was not renewable for an additional term. Technology-1980, however, had the option to acquire an additional development license that, in effect, allowed it to receive an exclusive sublicense from Elektra to continue to use the EOR technology beyond the original 5-year term of the license agreement.

In consideration for the license agreement with respect to EOR technology, Technology-1980 agreed to pay an annual license fee to Elektra in the amount of $35,000 per partnership unit. The maximum cumulative total license fee per partnership unit, however, was limited to $175,000. The annual license fee per partnership unit was payable to Elektra partly in cash and partly with recourse promissory

notes in the years indicated as follows:

| Year | Cash per partnership unit | Technology-1980's promissory notes to Elektra per partnership unit |
|------|------|------|
| 1980 | $3,540 | $31,460 |
| 1981 | 3,540 | 31,460 |
| 1982 | 3,540 | 31,460 |
| 1983 | --- | 35,000 |
| 1984 | --- | 35,000 |

The total principal amount of each of the promissory notes was due in the year 2005, plus simple interest at 12 percent per year.

The following schedule reflects the total of all of the promissory notes executed by Technology-1980 during the years indicated in favor of Elektra:

| Year note executed | Principal amount of notes (211.5 units × $31,460 or $35,000) | Due date |
|------|------|------|
| Nov. 30, 1980 | $6,653,790 | Dec. 31, 2005 |
| Nov. 30, 1981 | 6,653,790 | Dec. 31, 2005 |
| Nov. 30, 1982 | 6,653,790 | Dec. 31, 2005 |
| Nov. 30, 1983 | 7,402,500 | Dec. 31, 2005 |
| Nov. 30, 1984 | 7,402,500 | Dec. 31, 2005 |

The Elektra promissory notes were to be prepaid from available net cash-flow of Technology-1980 in the same manner the notes to TexOil were to be prepaid.

By executing the subscription agreement and the limited partnership agreement, each limited partner assumed personal recourse liability with respect to a pro rata share of a portion of Technology-1980's recourse debt obligations to TexOil and Elektra. The amount of Technology-1980's debt obligations to TexOil and Elektra with respect to which each of the limited partners assumed personal liability was $120,000 (which $120,000 corresponds in amount to the portion of each partner's total liability under his or her subscription agreement with Technology-1980 that was not reflected by promissory notes).

Technology-1980 gave Elektra a security agreement to secure the payment of the promissory notes relating to the license of EOR technology. Thereunder, Elektra received a security interest in all of the recourse promissory notes of

the limited partners of Technology-1980 relating to their subscription agreements with Technology-1980. In the event of a default by Technology-1980, Elektra had all of the rights and remedies of a secured party under the applicable state Uniform Commercial Code or as otherwise provided by law.

Technology-1980 could terminate without cause the license agreement with Elektra by giving 120 days' written notice to Elektra. As was the case with the TexOil agreement, Technology-1980 apparently could terminate the license agreement with Elektra at any time if the limited partnership was prevented from developing the heavy oil properties due to a BLM Wilderness order.

If Technology-1980 terminated the license agreement with Elektra, all of Technology-1980's debt obligations (including the recourse promissory notes) to Elektra would be extinguished except that portion of the obligations that had accrued prior to termination.

*Other Matters*

In the Technology-1980 offering memorandum, Basile, GEDC, TexOil, Elektra, and the shareholders, officers, and directors of the respective corporations were listed as groups or persons that may be deemed to be promoters of Technology-1980. The general partners of Technology-1980 were not officers or directors of Elektra or TexOil.

Under the Technology-1980 limited partnership agreement, the general partners have the exclusive and sole right to manage Technology-1980. The general partners' rights and powers listed in the limited partnership agreement and other documents include the right and power to borrow money, and to use any funds borrowed to meet the limited partners' debt obligations. Whether any such debt is incurred, however, is at the sole discretion of the general partners and any such additional debt would be subordinate to Elektra's and TexOil's security interests in the assets of the partnership.

Under the limited partnership agreement, if Technology-1980 is liquidated, the assets of the limited partnership are to be used or distributed as follows: first, to discharge the debt obligations of Technology-1980; second, to establish a

fund in a reasonable amount to pay unforeseen liabilities; and third, to the partners according to their partnership interests on the date of liquidation.

In 1980, Technology-1980 apparently paid a retainer fee to a law firm which was intended to obligate the law firm to handle without further charge all legal representation of the partnership and of the limited partners before the Internal Revenue Service and in litigation at the trial court level with respect to the tax benefits claimed by the limited partners in connection with their investments in Technology-1980. Elektra agreed to pay all costs of litigation at the appellate and Supreme Court levels relating to the tax benefits claimed by the investors.

Respondent issued timely notices of deficiency to petitioners R.A. Hildebrand and Dorothy L. Hildebrand Wahl with regard to their respective 1980, 1981, and 1982 Federal income tax returns. In the notices of deficiency, respondent determined the deficiencies in petitioners' Federal income tax liabilities that are at issue in this case with respect to Technology-1980.

### Barton Enhanced Oil Production Income Fund

Petitioner Gary E. Krause (Krause) is the tax matters partner for Barton Enhanced Oil Production Income Fund (Barton). At the time the petition was filed, Barton's principal place of business was in Wichita, Kansas.

Barton is one of three similar limited partnerships that comprise the Wichita Partnerships-1982. Barton and one of the other Wichita Partnerships-1982 were formed in 1982 under the uniform partnership law of Kansas. The other Wichita Partnerships-1982 limited partnership was formed in 1982 under the uniform partnership law of Pennsylvania.

Barton's original general partners were Krause and American Excel, Inc. (American Excel), a Utah corporation. In 1984, American Excel resigned and was replaced by Energy Associates, Inc. (Energy Associates), a Kansas corporation.

Barton offered investors the opportunity to purchase limited partnership interests or units in Barton. In 1982, Barton accepted subscriptions from 27 limited partners for a total of 50 units. The subscription fee for each limited partnership unit was in the amount of $34,400, with $14,800

of the subscription fee payable in cash and recourse promissory notes as follows:

| Cash | Promissory note | Due date |
|---|---|---|
| $5,000 | --- | On subscription |
| --- | $5,000 | [1]June 15, 1983 |
| --- | 1,600 | [1]June 15, 1984 |
| --- | 1,600 | [1]June 15, 1985 |
| --- | 1,600 | [1]June 15, 1986 |
| | 14,800 | |

[1]The promissory notes bore 11.5-percent simple interest beginning Jan. 1, 1983. With the exception noted below, no portion of the principal amount of the promissory notes was due until the due dates set forth above.

The $19,600 balance of each limited partner's subscription fee per investment unit that was not reflected by the above cash and notes was due September 30, 1997. No promissory notes were executed in connection with the $19,600 obligations, but the recourse nature of the limited partners' obligations with respect thereto is reflected in the subscription agreements and the limited partnership agreement.

Under the limited partnership agreement, Barton was required to retain a specific percentage of its cash-flow and to reinvest it in the limited partnership. Reinvested funds were to be treated as additional capital contributions made by the limited partners and thereby would operate to reduce the limited partners' debt obligations under the subscription agreements.

The Wichita Partnerships-1982 were formed to engage in oil and gas exploration and development. More specifically, Barton's primary objectives at the time it was formed were: (1) To acquire and operate producing oil and gas properties (the oil-income program); (2) to license and apply EOR technology (the EOR technology program); and (3) to sell chemicals, and to research and to develop services and equipment for lease to other oil producers (the distributorship program).

As part of its oil-income program, Barton allegedly sought to acquire oil and gas producing properties that represented a potential 100-percent cash-on-cash return on the investment within 4 years. Barton contracted with Midco Drilling, Inc. (Midco) to acquire on behalf of Barton working interests in oil and gas producing properties and to

operate the working interests. As compensation for acquiring the working interests for Barton, Midco was to be paid a 5-percent commission on the purchase price of the working interests. The compensation Midco was to receive for operating the working interests on behalf of Barton is not in the record.

*Debt Obligations to Hemisphere Licensing Corp.*

As part of its EOR technology program, Barton obtained a license for the use of, and distributorship rights to, a portfolio of EOR technology from Hemisphere Licensing Corp. (Hemisphere), a Texas corporation. The license was for a period of 25 years. Hemisphere's sole shareholder was Petrotec Systems, A.G., a Swiss corporation. The record before us in connection with the instant motions for partial summary judgment does not explain the difference between the EOR technology licensed by Technology-1980 from Elektra, and the EOR technology licensed by Barton from Hemisphere.

With certain adjustments, in consideration for the contractual rights received from Hemisphere, Barton agreed to pay Hemisphere an annual license fee of $8,500 per partnership unit. During the years 1982 through 1986, payment of the annual license fee was to be made partly in cash and partly with recourse promissory notes as follows:

| Notes to be issued on | Cash due per unit | Face amount of notes per unit[1] | Maturity date |
| --- | --- | --- | --- |
| 1982 on acceptance | $1,100 | 7,400 | Sept. 30, 1997 |
| July 1, 1983 | 1,100 | 7,400 | Sept. 30, 1997 |
| July 1, 1984 | 95 | 8,405 | Sept. 30, 1997 |
| July 1, 1985 | 95 | 8,405 | Sept. 30, 1997 |
| July 1, 1986 | 95 | 8,405 | Sept. 30, 1997 |

[1]All of the notes bear annual simple interest at 12 percent.

With the exception of certain required minimum payments explained below, the only payments due on the promissory notes prior to the maturity date of the notes were dependent on the cash-flow of the partnership.

Minimum installment payments are due on each of the notes outstanding with respect to each partnership unit, as follows:

| Amount per unit | Date due |
|---|---|
| $2,000 ............................... | Sept. 30, 1993 |
| 4,000 ............................... | Sept. 30, 1994 |
| 6,000 ............................... | Sept. 30, 1995 |
| 11,000 ............................... | Sept. 30, 1996 |
| 19,600 ............................... | Sept. 30, 1997 |

By executing the subscription agreement and limited partnership agreement, each limited partner assumed personal recourse liability with respect to a pro rata share of a portion of Barton's recourse debt obligations to Hemisphere. The amount of Barton's debt obligations with respect to which each of the limited partners assumed personal liability was $19,600 (which $19,600 corresponds in amount to the portion of each partner's total liability under his or her subscription agreement with Barton that was not reflected by promissory notes). Each limited partner's $19,600 liability, however, was not immediately effective. The schedule below reflects the dates on which the limited partners' liabilities on Barton's debt obligations to Hemisphere were to become effective:

| Amount of liability assumed | Effective date of assumption |
|---|---|
| $5,000 ............................... | On subscription |
| 5,000 ............................... | July 1, 1983 |
| 3,200 ............................... | July 1, 1984 |
| 3,200 ............................... | July 1, 1985 |
| 3,200 ............................... | July 1, 1986 |
| 19,600 | |

If Barton fails to make the minimum payments for any partnership unit, Barton has 60 days to collect additional contributions from the particular limited partner whose account is delinquent. Additional contributions from the limited partners would be used by Barton to make the minimum payments due Hemisphere. In the event Barton or the limited partner fails to make the payments within 60 days, Hemisphere has the right either to declare the full principal amount of the outstanding notes due and payable and to initiate collection proceedings directly against each limited partner who has not made the required contributions or to foreclose on the limited partner's interest in the partnership.

In return for its efforts to distribute or license the EOR technology to other oil production companies or partnerships within its own territory, Barton was to be paid a commission by Hemisphere generally in the amount of 25 percent of any royalties or license fees received by Hemisphere from companies licensed through Barton.

In addition, a joint marketing organization was established by Barton and Hemisphere to distribute or license EOR technology outside of Barton's territory. Generally, Barton was entitled to receive a commission of 30 percent of royalties received by Hemisphere with respect to such licenses. Apparently, this joint marketing organization could not be terminated without cause.

Barton and Hemisphere entered into a security agreement to secure Barton's debt obligations to Hemisphere. Barton granted Hemisphere security interests in the EOR technology licensed from Hemisphere, and in all of Barton's other assets such as the capital contributions of the limited partners due in 1993 through 1997. In the event of a default by Barton, Hemisphere had all rights and remedies under the applicable State Uniform Commercial Code or as otherwise provided by law.

At the end of any calendar year, Barton could terminate without cause, the license agreement with Hemisphere by giving Hemisphere 90 days' written notice. If Barton terminated the license agreement, the balances due on Barton's promissory notes and other debt obligations to Hemisphere would be extinguished except for that portion of such obligations that had become due and payable prior to the date of termination.

*Other Matters*

The license agreement between Barton and Hemisphere included a "Tax Defense" provision under which Hemisphere agreed to provide funds for any legal representation required in connection with any Internal Revenue Service audit or court litigation concerning the limited partners' entitlement to tax benefits claimed with respect to their investments in Barton.

It appears that petitioner Krause, Energy Associates, and Hemisphere were regarded as promoters of Barton.

Under the terms of the limited partnership agreement, Barton was to be managed solely and exclusively by the general partners, and the general partners had the right and power to borrow additional funds for the purpose of developing and acquiring oil and gas properties. Any such additional loans were to be nonrecourse as to the limited partners.

Under the limited partnership agreement, if Barton is liquidated, the assets of the limited partnership are to be used and distributed in the following order: first, to discharge the debt obligations of Barton; second, to establish a fund in a reasonable amount to pay unforeseen liabilities; and third, to the partners according to their partnership interests on the date of liquidation.

Respondent issued a timely notice of final partnership administrative adjustment (FPAA) to petitioner Krause, as the tax matters partner for Barton. In the FPAA, respondent made adjustments to the 1982 and 1983 Federal partnership tax returns of Barton.

### *Applicable Law*

A decision on a motion for summary judgment may be rendered if material submitted in support of the motion establishes that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law. Rule 121(b). Either party may move for summary judgment in its favor on all or part of the issues in controversy. Rule 121(a).

The party seeking summary judgment bears the initial responsibility to inform the court of the basis for its motion and to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Adickes v. Kress & Co.,* 398 U.S. 144, 157 (1970); *Espinoza v. Commissioner,* 78 T.C. 412, 416 (1982).

### *At-risk Issues*

Under section 465, losses relating to oil and gas activities are allowed as deductions only to the extent investors are

at risk financially with respect to the activities. Sec. 465(a)(1); sec. 465(c)(1)(D).[2] Investors generally are considered to be at risk financially to the extent they contribute money to the activities. Sec. 465(b)(1)(A). In addition, investors are considered to be at risk financially with respect to third-party debt obligations relating to the activities to the extent they are personally liable for repayment of the debt obligations or to the extent they have pledged property, other than property used in the activities as security for the debt obligations. Secs. 465(b)(1)(B) and 465(b)(2).[3] The determination of whether a taxpayer is to be regarded as at risk on particular debt obligations is to be made at the end of each taxable year. Sec. 465(a)(1); *Levy v. Commissioner*, 91 T.C. 838, 862 (1988).

Investors will be regarded as personally liable, under section 465(b)(2)(A), on particular third-party debt obligations if, in the event funds from the investment activities are not available to repay the obligations, the investors are ultimately and personally liable to repay the obligations. The critical inquiry is who is the obligor of last resort, and the scenario that controls is the worst case scenario, not the best case scenario. The fact that other investors or entities remain in the chain of liability does not detract from the at-risk amount of investors who have the ultimate liability, and in determining which investors are ultimately financially responsible for the debt obligations, the substance of the transaction controls. *Levy v. Commissioner*, 91 T.C. at 862-863; *Melvin v. Commissioner*, 88 T.C. 63, 75 (1987), on appeal (9th Cir., Aug. 7, 1987). See *Pritchett v. Commissioner*, 827 F.2d 644, 647 (9th Cir. 1987), revg. and

[2] Sec. 465 was added to the Internal Revenue Code by the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, and applies to tax years beginning after Dec. 31, 1975. Sec. 465(a) makes no reference to partners, partnerships, or joint ventures but it is clear that sec. 465 was intended to apply to those entities. See *Bennion v. Commissioner*, 88 T.C. 684, 691 n. 6 (1987); *Melvin v. Commissioner*, 88 T.C. 63, 70 (1987), on appeal (9th Cir., Aug. 7, 1987).

[3] Sec. 465(b)(2) provides as follows:

(2) BORROWED AMOUNTS.—For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he—
(A) is personally liable for the repayment of such amounts, or
(B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property).
No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1).

remanding 85 T.C. 580 (1985); *Follender v. Commissioner,* 89 T.C. 943, 949-950 (1987). See also *Raphan v. United States,* 759 F.2d 879, 885 (Fed. Cir. 1985).

Another limitation on debt obligations owed to third-parties with respect to which investors will be considered at risk is reflected in section 465(b)(4).[4] That section provides that even though investors nominally may be personally liable with respect to debt obligations, for tax purposes they will not be considered at risk with respect thereto if their ultimate liability is protected against loss through "nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." The language "other similar arrangements" is not specifically defined in the Code or in the legislative history, but the legislative history does evidence concern with situations in which investors are effectively immunized from any realistic possibility of suffering an economic loss even though the underlying transaction was not profitable. *Levy v. Commissioner, supra* at 864; *Larsen v. Commissioner,* 89 T.C. 1229, 1272-1273 (1987), on appeal (9th Cir., Dec. 12, 1988); *Melvin v. Commissioner, supra* at 70-71; *Bennion v. Commissioner,* 88 T.C. 684, 692 (1987); *Porreca v. Commissioner,* 86 T.C. 821, 838 (1986); S. Rept. 94-939 (1976), 1976-3 C.B. (Vol. 3) 49, 87.

Section 465(b)(3) imposes a further limitation on amounts with respect to which investors will be considered at risk.[5] Under that provision investors in general will not be considered at risk on debt obligations if the particular third-party creditors associated with the debt obligations have continuing interests in the activities other than as creditors. In 1979, the Treasury issued proposed regulations under section 465(b)(3) which provide that creditors will be deemed to have prohibited other interests if they have either a "capital interest" in the activity, or an interest in

---

[4]Sec. 465(b)(4) provides as follows:

(4) EXCEPTION.—Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.

[5]Sec. 465(b)(3) provides, in relevant part, as follows:

(3) CERTAIN BORROWED AMOUNTS EXCLUDED.—For purposes of paragraph (1)(B), amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who—

(A) has an interest (other than an interest as a creditor) in such activity, * * *.

the "net profits" of the activity. Sec. 1.465-8(b), Proposed Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979).[6] Proposed Treasury regulations do not have the force of law. *Zinniel v. Commissioner,* 89 T.C. 357, 369 (1987), on appeal (7th Cir., March 9, 1988). In prior Tax Court opinions, however, we have utilized the two tests set forth in section 1.465-8(b), Proposed Income Tax Regs., as a guideline in determining whether creditors in a transaction have prohibited other interests. *Levy v. Commissioner, supra* at 867; *Bennion v. Commissioner, supra* at 696.

A capital interest is described in the proposed regulations as an interest in the assets of the activity which would make the assets, or a portion of the assets, distributable to the creditor upon liquidation of the activity. Sec. 1.465-8(b)(2), Proposed Income Tax Regs., *supra.* The proposed regulations do not include a description of a net-profits interest. They do state that it is not necessary for a person to have incidents of ownership in the activity in order to have a net-profits interest. Sec. 1.465-8(b)(3), Proposed Income Tax Regs.

In *Bennion v. Commissioner,* 88 T.C. 684, 698 (1987), we explained what we perceived the policy underlying section 465(b)(3) to be, as follows:

Creditors who hold recourse obligations, but who also have certain other interests in the activity, might disregard their rights thereunder in favor of protecting or enhancing their other interests in the activity. In light of that eventuality and in spite of the otherwise recourse nature of the debt, taxpayers who owe recourse debt obligations to such creditors are not to be regarded as at risk with respect thereto.

---

[6]Sec. 1.465-8(b), Proposed Income Tax Regs., 44 Fed Reg. 32239 (June 5, 1979), provides, in relevant part:

(b) *Loans for which the borrower is personally liable for repayment.*—(1) *General rule.* If a borrower is personally liable for the repayment of a loan for use in an activity, the lender shall be considered a person with an interest in the activity other than that of a creditor only if the lender has either a capital interest in the activity or an interest in the net profits of the activity.

(2) *Capital interest.* For the purposes of this section a capital interest in an activity means an interest in the assets of the activity which is distributable to the owner of the capital interest upon the liquidation of the activity. The partners of a partnership and the shareholders of a corporation described in section 1371(b) are considered to have capital interests in the activities conducted by the partnership or corporation,

(3) *Interest in net profits.* For the purposes of this section it is not necessary for a person to have any incidents of ownership in the activity in order to have an interest in the net profits of the activity. For example, an employee or independent contractor any part of whose compensation is determined with reference to the net profits of the activity will be considered to have an interest in the net profits of the activity.

Based on the above principles, we conclude that the "other interests" prohibited under section 465(b)(3) are those fixed and definite interests or rights that realistically may cause the third-party creditors to act contrary to how independent creditors would act with respect to the debt obligations in question. *Levy v. Commissioner, supra* at 868.

Petitioners Hildebrand, Wahl, and Krause properly concede that they are not considered at risk under sections 465(b)(1)(B) and (b)(2) with respect merely to their personal recourse obligations to Technology-1980 under their subscription agreements. See *Melvin v. Commissioner, supra* at 71, 73. Petitioners contend, however, that they should be considered at risk for their pro rata share of Technology-1980's and their share of Barton's recourse debt obligations to TexOil, Elektra, and Hemisphere to the extent they assumed personal recourse liability on those debt obligations.

More specifically, petitioners Hildebrand and Wahl contend that they personally assumed and should be regarded as at risk with respect to the total cumulative balance due on the $5,000 per unit minimum annual royalties due TexOil. They also contend that they personally assumed and generally should be regarded as at risk with respect to their $175,000 per unit liability on the license fees due Elektra. They also acknowledge, however, that the ceiling of $120,000 on their total maximum cumulative liability with respect to all of Technology-1980's debt obligations to both TexOil and Elektra limits their annual at-risk amount under section 465 to that amount (namely, $120,000).

Petitioner Krause contends that each of the limited partners of Barton personally assumed and should be regarded as at risk on Barton's debt obligations to Hemisphere to the extent of the limited partners' $19,600 total liability with respect to those obligations.

Respondent contends that the partners should not be regarded as at risk with respect to any of the above debt obligations on the basis of the following arguments: (1) The partner's assumptions of the partnership debt obligations constitute improper attempts to convert mere subscription agreement obligations into at-risk amounts; (2) the offsets and reductions available from the net cash-flow of the

partnerships and from the overriding royalties (against the partners' liabilities on their subscription agreements and partnership debt obligations) require that the debt obligations be regarded either as nonrecourse or that the partners be regarded as protected against loss with regard to the debt obligations; (3) the power of the general partners to borrow additional funds on behalf of the partnerships and to use the borrowed funds to pay off the partnerships' debt obligations constitutes a protection against loss with regard to the partnerships' debt obligations; and (4) the creditors TexOil, Elektra, and Hemisphere had, for at-risk purposes, prohibited interests in the activities of the partnerships other than as creditors because of their promoter status, because they had net profits and capital interests in the partnerships, because of their role in the tax-oriented legal defense fund, and because of Hemisphere's participation in the joint marketing organization.

We reiterate that in analyzing the issues properly before us on summary judgment, we have assumed, solely for purposes of these motions, that the debt obligations of the partnerships to TexOil, Elektra, and Hemisphere are genuine. As explained, respondent has moved for partial summary judgment on the issue of whether the partnerships' debt obligations are genuine. A determination of that issue, however, involves certain factual matters not established in the record before us (e.g., the value of the EOR technology and the license agreements), and it would be premature for us to decide that issue on summary judgment. We deny respondent's motion for partial summary judgment on the issue of whether the partnerships' debt obligations are genuine.

*Sections 465(b)(1)(B) and (b)(2)—Personal Recourse Liability*

We address first petitioners' contention that the limited partners are personally liable and at risk under sections 465(b)(1)(B) and (b)(2) for the full amount of their per unit maximum liability on the recourse debt obligations of the partnerships in the year the limited partners first made their investments in the partnerships (namely, for $120,000 for each of the limited partners of Technology-1980 and $19,600 for each of the limited partners of Barton). Petition-

ers' contention in this regard is patently wrong as a matter of law. It ignores the explicit terms of the debt obligations and the terms under which the limited partners assumed personal liability with respect thereto.

With regard to the debt obligations relating to the minimum annual royalties, Technology-1980 only has the obligation to pay TexOil minimum annual royalties of $5,000 per partnership unit. The limited partners, therefore, at most, can only be regarded as at risk on these obligations of Technology-1980 as the obligations came into existence (i.e., at the rate of $5,000 per partnership unit per year). This result is appropriate particularly where, as in this case, the partnership has the right to terminate, without cause and on 30 days' notice, the agreement with TexOil and thereby to relieve itself of any further debt obligations to TexOil relating to the minimum annual royalties that otherwise would have accrued in subsequent years.

With regard to Technology-1980's annual license fees, Technology-1980 only has the obligation to pay Elektra annual license fees of $35,000 per partnership unit. The limited partners, therefore, at most, can be regarded as at risk with regard to these obligations of Technology-1980 only as their liability therefor came into existence (i.e., at the rate of $35,000 per partnership unit per year until the maximum liability assumed of $120,000 per partnership unit is reached). Again, this result is supported particularly by Technology-1980's unilateral right of termination of the license agreement.

With regard to Barton's annual license fees to Hemisphere, Barton's obligation was only to pay Hemisphere $8,500 per partnership unit, and each limited partner's liability with respect thereto was further modified by the limited partnership agreement under which each limited partner's personal liability therefor only accrued at the rate of $5,000 during 1982 and 1983, and $3,200 during 1984, 1985, and 1986. The limited partners, therefore, can be regarded as at risk with regard to these obligations only as their liability therefor came into existence. This result also is supported by Barton's right of termination of the license agreement, under which the limited partners on termination

would be liable only for the portion of the license fees accrued prior to termination according to the modified accrual schedule.

To the extent only of the fixed and definite accruals each year of the partnerships' minimum annual royalties and annual license fees (and only to the extent of the limited partners' assumption of those accrued debt obligations) can the limited partners be regarded, at the end of each year, as at risk under sections 465(b)(1)(B) and (b)(2). To that extent, they were personally liable on a recourse basis with regard to the limited partnerships' debt obligations to third parties. To that extent, under Utah, Texas, Kansas, and Pennsylvania law, TexOil, Elektra, and Hemisphere would be regarded as intended third-party beneficaries and would be entitled to enforce the debt obligations personally against the limited partners. *Tracy Collins Bank & Trust v. Dickamore,* 652 P.2d 1314, 1315 (Utah 1982); *Rio Algom Corp. v. Jimco Ltd.,* 618 P.2d 497, 506 (Utah 1980); *Schwinghammer v. Alexander,* 21 Utah 2d 418, 446 P.2d 414, 415 (1968); *Dairyland County Mut. Ins. v. Childress,* 650 S.W.2d 770, 775 (Texas 1983); *Republic Nat. Bank v. National Bankers Life Ins. Co.,* 427 S.W.2d 76, 79 (Texas Civ. App. 1968); *Fasse v. Lower Heating and Air Conditioning, Inc.,* 241 Kan. 387, 736 P.2d 930, 932 (1987); *Cornwell v. Jespersen,* 238 Kan. 110, 708 P.2d 515, 520-521 (1985); *Guy v. Liederbach,* 501 Pa. 47, 459 A.2d 744 (1983).

For the reasons explained, petitioners' motions for partial summary judgment on this issue will be granted only in the amounts set forth above, and respondent's motion for partial summary judgment on this issue will be granted as to the balance of the at-risk amounts claimed by petitioners.

*Section 465(b)(4)—Protection Against Loss*

The next issue for decision is whether the limited partners were protected against loss, within the meaning of section 465(b)(4), with respect to the otherwise recourse debt obligations of the partnerships. Respondent moves for partial summary judgment on this issue based primarily on the similarity in the amount of the debt obligations assumed by the limited partners and the amount of the limited partners' liabilities under the subscription agree-

ments. In support of his argument on this issue, respondent also relies on the borrowing authority of the general partners and the manner by which the net cash-flow and overriding royalties potentially offset or pay off partnership debt obligations (thereby relieving the limited partners of making any payments on the debt obligations). Similar arguments have been rejected in numerous cases, and we reject them here.

As stated, it is the obligor of last resort that is to be regarded as at risk under section 465. The fact that funds may be available from other sources to make payment on debt obligations does not detract from the liability of the debtor of last resort to make such payment if the funds are not forthcoming.

Petitioners' motion for partial summary judgment on this issue will be granted.

*Section 465(b)(3)—Interests Other Than As Creditors*

Respondent argues that the ultimate creditors, TexOil, Elektra, and Hemisphere, under section 465(b)(3), have prohibited continuing interests in the activities of the partnerships other than as creditors because of their promoter status, because of their net profits and liquidation interests in the partnerships, and because of their financial participation in the legal defense of the claimed tax benefits. Respondent also argues that under the joint marketing organization which Barton and Hemisphere established, Hemisphere had a continuing prohibited other interest in the transaction.

Nothing in the applicable authority pertaining to section 465(b)(3) suggests that the mere promoter status of a creditor with respect to a particular transaction will cause the creditor thereafter to be regarded as having a prohibited continuing interest in the transaction. If that were the law, debt obligations associated with almost every seller-financed transaction would violate section 465(b)(3) because the seller generally would be regarded as a promoter with regard to the transaction.

Respondent's arguments concerning the net profits and liquidation interests of TexOil, Elektra, and Hemisphere similarly are in error. As explained in our findings of fact,

the net profits and liquidation interests of TexOil, Elektra, and Hemisphere in this case are limited to securing repayment of the debt obligations owed to them. As such, these continuing interests are not "other" interests of the creditors but are integral to, and are an incidental part of their interests as creditors. See *Jackson v. Commissioner,* 86 T.C. 492, 529 (1986), affd. 864 F.2d 1521 (10th Cir. 1989).

The agreement of Elektra and Hemisphere to pay for the legal defense of the tax benefits claimed by the limited partners is unusual and suspect. It may constitute a prohibited other interest under section 465(b)(3). We, however, do not have sufficient facts before us concerning this agreement to decide this issue in the context of this motion for partial summary judgment.

The joint marketing organization established by Barton and Hemisphere appears to be the type of continuing, long-term, and noncredit-related relationship between debtors and creditors that section 465(b)(3) was intended to reach. It apparently could not be terminated by Barton without cause. It had no fixed termination date, and Hemisphere's potential income therefrom might arguably compete with its interest as the creditor with respect to the license fees. However, we do not have sufficient facts before us concerning the distribution agreement to resolve this issue in the context of this motion for partial summary judgment.

Petitioners also argue that the debt obligations owed to TexOil, Elektra, and Hemisphere in later years could have been (and in some cases were) sold or assigned to independent third parties. Thus, they argue that any tainted "interests other than as creditors" that TexOil, Elektra, and Hemisphere may have had should be ignored. We reiterate that the at-risk rules of section 465 are to be applied to the relevant facts of a transaction as they exist at the end of each taxable year. Whether creditors in subsequent years sell off to other creditors debt obligations owed to them has no particular bearing on the determination of whether the initial creditors had prohibited other interests during the years before the Court.

Petitioners' last argument concerning the interest-other-than-a-creditor rules of section 465(b)(3) is that under

section 465(c)(3)(D) the limitations of section 465(b)(3) become applicable to activities that were made subject to the at-risk rules of section 465 for the first time by the Revenue Act of 1978, section 201, Revenue Act of 1978, 92 Stat. 2814, "only to the extent provided in regulations prescribed by the Secretary."[7] Petitioners argue that the activities of Technology-1980 and of Barton relating to EOR technology were new activities not subject to the at-risk rules prior to the Revenue Act of 1978. Petitioners therefore argue that because respondent has not yet promulgated any regulations as contemplated by section 465(c)(3)(D), the interest-other-than-a-creditor rule of section 465(b)(3) cannot apply to the "new activities" of Technology-1980 or of Barton.

Respondent provides no explanation as to why the legislative regulations contemplated by section 465(c)(3)(D) have not been promulgated in the intervening 11 years since the enactment of the Revenue Act of 1978. On this issue, respondent merely argues that the activities of Technology-1980 and of Barton are not new activities made subject to the at-risk rules for the first time by the Revenue Act of 1978 and therefore that the activities of Technology-1980 and Barton are subject to the section 465(b)(3) interest-other-than-a-creditor rules regardless of the absence of the regulations contemplated by section 465(c)(3)(D). In the context of the pending cross-motions for partial summary judgment, we do not have before us sufficient facts concerning the EOR technology to determine whether the partnerships' activities with regard thereto constituted "new activities" under the Revenue Act of 1978.

For the reasons explained, petitioners' and respondent's motions for partial summary judgment with respect to the interest-other-than-a-creditor issue will be denied. Petitioners' motion will be denied because of factual questions concerning the legal defense fund, the joint marketing organization, and the EOR technology, which make their

---

[7]Sec. 503 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2243, redesignated Internal Revenue Code of 1954 sec. 465(c)(3)(E) as sec. 465(c)(3)(D). All such references made herein are to the redesignated section.

Sec. 465(c)(3)(D) provides as follows:

(D) APPLICATION OF SUBSECTION (b)(3).—In the case of an activity described in subparagraph (A), subsection (b)(3) shall apply only to the extent provided in regulations prescribed by the Secretary.

motion premature on this issue. Respondent's motion will be denied because of the erroneous nature of his legal arguments on this issue and because of the additional relevant factual questions still in dispute.

*Appropriate orders will be issued.*