SOL HENKIND AND EVELYN HENKIND, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; DAVID B. SIMPSON AND NANCY S. SIMPSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Henkind v. Commissioner
Docket Nos. 6299-89, 6337-89
United States Tax Court
T.C. Memo 1992-555; 1992 Tax Ct. Memo LEXIS 579; 64 T.C.M. (CCH) 807; T.C.M. (RIA) 92555; September 22, 1992, Filed *579 Decision will be entered for petitioners in docket No. 6299-89. Decision will be entered under Rule 155 in docket No. 6337-89. For Petitioners: Elliot I. Miller and Robert T. Gradoville. For Respondent: Jane Beaver Wilson, Mark L. Hulse, and Dean Scott. JACOBS
JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: These cases were assigned to Special Trial Judge D. Irvin Couvillion pursuant to section 7443A(b)(4) [1] and Rules 180, 181, and 183. The Court agrees with and adopts the Special Trial Judge's opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE COUVILLION, Special Trial Judge: In these consolidated cases, respondent determined deficiencies in and additions to petitioners' 1982 Federal income taxes as follows: Addition to Tax
and Increased
Interest
Petitioners
Docket No.
Deficiency
Sec. 6661
Sec. 6621(c)
Henkind
6299-89
$ 321,196.12
$ 80,299.03
[1]
Simpson
6337-89
$ 106,488.00
$ 26,622.00
[1]
*580 The issues are whether petitioners, as limited partners, are entitled to deduct their distributive share of the loss sustained by a partnership engaged in automobile leasing, and whether, as a result, petitioners are liable for the section 6661 addition to tax and increased interest under section 6621(c). In the notices of deficiency, respondent determined that the partnership in which petitioners were partners did not enjoy the benefits and burdens of ownership of the vehicles leased; that, if the partnership was imbued with the benefits and burdens of ownership, the leasing activity was not engaged in for profit under section 183; and, if the activity was engaged in for profit, petitioners are not entitled to deductions in excess of their cash capital contributions for the reason that petitioners were not at risk under section 465. All other adjustments in the notices of deficiency are computational adjustments which will be resolved by the partnership issue. *581 In addition, as to petitioners David B. and Nancy S. Simpson, other adjustments in the notice of deficiency were conceded by them during the audit. A threshold issue, raised by respondent, is whether petitioners are collaterally estopped from litigating the issues here because of certain allegations by them in civil actions in Federal and State courts against the general partner and others involved with the partnership and the dismissal, by the Federal court, of one cause of action asserted by petitioners. FINDINGS OF FACT Some of the facts were stipulated and are so found. Petitioners Sol and Evelyn Henkind resided at Scarsdale, New York, at the time their petition was filed. Petitioners David B. and Nancy S. Simpson resided at Tenafly, New Jersey, at the time their petition was filed. Petitioner David B. Simpson (Mr. Simpson) is an attorney who practices primarily in the areas of real estate, corporate law, and corporate financing. Sometime during the late 1970s, Mr. Simpson began representing petitioner Sol Henkind (Mr. Henkind). Mr. Henkind had been in the real estate development business since 1936 as an owner and builder. Over the years, Mr. Henkind invested in other *582 ventures, including a furniture supply business, an air conditioning supply business, and coat manufacturing. He also invested in gold as a hedge against inflation. At the time of trial, Mr. Henkind was 80 years old. In 1981, Mr. Henkind was advised by his accountant of an investment opportunity in the automobile leasing business with Aleet Leasing (Aleet), whose principals were Barry Zucker (Mr. Zucker), Norm Samuels (Mr. Samuels), and Stewart Bernstein (Mr. Bernstein). Mr. Henkind contacted his attorney, Mr. Simpson, about the matter. Mr. Simpson arranged a meeting with Mr. Zucker and his attorney, Simon Jacobson (Mr. Jacobson), at the offices of Mr. Jacobson's law firm. Neither Mr. Simpson nor Mr. Henkind had any prior experience in or knowledge of the automobile leasing business. At a series of meetings, they received information about the business from Messrs. Zucker, Samuels, and Jacobson. The proposed leasing business interested Mr. Henkind in several respects. The activity would be conducted through a limited partnership in which Mr. Henkind would be a limited partner. Profits could be expected in two areas. First, the total purchase price of each leased automobile *583 was to be financed through a bank or lending institution, and the monthly payments by the lessee included a 15-percent override which inured to the benefit of the partnership. Secondly, at the end of the lease term, although a balance remained due on the vehicle, referred to as a "balloon" payment, the amount of the balloon was always less than the fair market value of the vehicle. The difference between the fair market value of the vehicle and the balloon was referred to as the "residual" value. Although all lessees had the option to purchase the vehicle at the end of the lease either for the amount of the balloon or, in some cases, a nominal amount, statistics in the leasing industry showed that a significant number of lessees would not exercise the purchase option, thus affording the partnership the opportunity to realize on the residual value of the vehicle. In addition, the purchase option to a lessee was forfeited if a lease was terminated before the end of the lease. The activity proposed by Aleet contemplated that the total cost of all vehicles would be financed by a bank or other lending institution. Automobiles would be purchased on an individual basis, as lessees *584 were found. No automobiles would be kept in stock or in inventory. Once a lease was entered into, the partnership would assign the lease to the lending bank, with recourse, and all monthly payments would thereafter be made by the lessee directly to the bank. Leases and the financing of the vehicles would generally be for 36-month terms, with the balloon payment due at the end of the lease. Where the lessee did not exercise the purchase option, the partnership would pay the balloon payment and thereafter would either sell or re-lease the vehicle and thereupon realize on the vehicle's residual value. It was explained to Mr. Henkind that a significant number of lessees could be expected not to exercise the purchase option at the end of a lease for several reasons. Some lessees did not like the car and did not have the means or the desire to dispose of the car, while others did not have the resources to pay the balloon. Also, other leases would terminate either by default or for other reasons during the lease term, in which event, the purchase option was forfeited. It was represented to petitioners that the purchase option would not be exercised by approximately 50 percent of the *585 lessees and approximately 25 to 30 percent of leases would not go the full term. Another factor which enhanced the leasing business was that, during 1981 and 1982, the economy of the United States was in a period of rising inflation and high interest rates. As a result, prices of new automobiles were rising, which depressed sales of new automobiles. The correspondent effect was that the values of used automobiles were rising. This meant that, at the end of a 3-year lease, the residual value of an automobile could be expected to be high. It was represented to Mr. Henkind that the residual values of automobiles could range from 35 to 50 or 60 percent of an automobile's original cost. In luxury vehicles, the residual could sometimes be expected to equal the original cost. The opportunities from realizing on these residual values looked promising in 1981, and these trends were corroborated by numerous articles in trade journals which came to the attention of Mr. Henkind and Mr. Simpson. However, it was understood that the profit potential on the residuals could not be realized until 3 or 4 years. The structure proposed by Aleet called for the partnership to engage the services *586 of an agent whose function would be to solicit leases and arrange for the purchase of the vehicles and their financing. The agent would follow through with the transaction at the end of the leases, including the sale or releasing of the vehicles not purchased by lessees. The agent would warrant or guarantee the partnership that a certain volume (expressed in dollars) of automobiles would be leased each year for a period of 8 years. Mr. Henkind insisted that, before he would participate in the leasing business with Aleet, the principals of Aleet would have to personally guarantee the obligations of the agent and, in particular, the obligations of the agent to lease a designated dollar amount of vehicles for the 8 years. The principals of Aleet declined to provide such a guaranty and, therefore, the transaction with Aleet was never consummated. Sometime after the negotiations with Aleet were terminated, Mr. Samuels advised Mr. Henkind that he knew of a larger leasing company which would be willing to participate in a similar transaction and whose principal would provide the personal guaranty Mr. Henkind had insisted on in the Aleet transaction. The company suggested by Mr. Samuels *587 was Term Industries, Inc., a corporation engaged in the automobile leasing business whose president and 90 percent owner was Gerald Brauser (Mr. Brauser). Mr. Brauser had been in the automobile leasing business for 20 years and, having previously owned automobile dealerships, had been involved with automobile sales and leasing for 40 years. The volume of Mr. Brauser's automobile leasing activities approximated $ 10 million per year. He had from 30 to 35 employees in his operation, which included credit, insurance, and collection departments, as well as a sales area to market cars taken over after leases expired or terminated. Mr. Brauser had an established base for leasing automobiles through referrals from automobile dealers, his own customer base, and some of his employees were salesmen who solicited customers for leasing. As of December 31, 1980, Mr. Brauser's personal financial statement showed a net worth of $ 2,691,194, and, as of June 30, 1982, his net worth was $ 4,686,760. Mr. Simpson, who had now agreed to participate in a leasing activity with Mr. Henkind, retained attorney Harvey S. Berenson (Mr. Berenson) to represent them in negotiations with Mr. Brauser, who was *588 also represented by Mr. Jacobson. Mr. Berenson had previously been Mr. Simpson's law partner. Mr. Berenson, on behalf of Mr. Henkind and Mr. Simpson, negotiated with Mr. Jacobson and Mr. Brauser. Term Industries, Inc., would be the general partner of Term Leasing Associates, a limited partnership to be organized for the purpose of purchasing and leasing of automobiles to customers as a trade or business. The purchases and leases would be made by an agent for the partnership, Circle Leasing, Inc. (Circle), a company of which Mr. Brauser was president and 90 percent owner. Mr. Brauser agreed to personally guarantee the performance of Circle under the agency agreement. Although the parties began their negotiations on the same basis as the proposed Aleet transaction, at Mr. Berenson's persuasion, the arrangement was revised to provide for recovery of additional amounts as damages in the event the agent defaulted on its obligation to acquire and lease automobiles for the partnership. Mr. Henkind and Mr. Simpson became limited partners in Term Leasing Associates on April 8, 1981. The sole general partner was Term Industries, Inc., having a 1-percent capital interest, with Mr. Henkind *589 and Mr. Simpson as limited partners having, respectively, 89.1-percent and 9.9-percent capital interests. Petitioners contributed cash and promissory notes totaling $ 712,000 for their capital interests. The notes were paid in accordance with their terms. The partnership agreement provided for additional capital contributions by the limited partners under certain conditions. That provision, referred to as the "overcall", was as follows: 3.3 Additional Capital Contributions. In addition to their initial capital contribution to the Partnership pursuant to Sections 3.1 and 3.2 hereof, each of the Partners shall be obligated and personally liable to make any number of Additional Capital Contributions to the capital of the Partnership, upon request by the General Partner, in the amount of such Partner's pro-rata share of any liabilities hereafter incurred by the Partnership pursuant to Section 5.1(b) hereof, but in no event shall the aggregate amount of such Additional Capital Contributions exceed $ 3,000,000; provided, however, that such Additional Capital Contributions shall be required to be paid at least thirty (30) days after the notice referred to in the next sentence is *590 given. Each such request for Additional Capital Contributions shall be made by written notice to each of the Partners no less than ten (10) days prior to the due date for such Additional Capital Contributions, and such notice shall state (i) the aggregate Additional Capital Contributions requested of all Partners, (ii) such Partner's pro-rata share of such aggregate Additional Capital Contributions, determined in proportion to the respective Partnership Interest of the Partners, and (iii) the date on which payment of such Additional Capital Contributions is due. An agency agreement was executed between the partnership as principal and Circle as agent. The agreement required Circle to arrange financing and purchase, on behalf of the partnership, automobiles with an aggregate cost of $ 1,500,000 during each of the following periods: (1) From the inception of the agreement to August 31, 1981; (2) between September 1, 1981, and June 30, 1982; (3) between July 1, 1982, and June 30, 1983; and (4) during each subsequent period of 12 months ending June 30 occurring between July 1, 1983, and June 10, 1988. The agent was to provide written certification to the limited partners of the aggregate *591 cost of automobiles purchased and leased by the partnership by the end of the month following the close of each of the purchase periods. The agent's performance was personally guaranteed by Mr. Brauser. The partnership agreement called for a management fee to be paid, as a guaranteed payment to the general partner, of $ 90,000 per year for the first 3 years, and a base management fee to be paid the agent, Circle, of $ 132,000 per year during the period 1981 through and including 1988, and $ 3,000 per year for 1989 through and including 1992. Circle was also to be paid a base leasing fee of 7 percent of the cost of automobiles purchased to replace vehicles where leases were terminated prior to the end of their stated terms. Additionally, Circle would receive 50 percent of the net residual proceeds realized by the partnership from the sale of automobiles. During 1982, the parties renegotiated the agreements to provide for an increased level of vehicle purchases, correspondent additional capital contributions from petitioners, and an increase in the overcall provision for additional capital contributions to $ 6 million. Prior to the renegotiation, Mr. Berenson, on behalf of petitioners, *592 researched residual values of various types of automobiles. Assuming various levels of residuals and percentages of purchase options exercised, Mr. Berenson prepared a cash-flow analysis for the partnership based on the proposed expansion. By his projections, Mr. Berenson concluded that an additional $ 400,000 capital investment by petitioners would increase the partnership's profits by between $ 1 million and $ 1,400,000. He further concluded that, even if no profits were realized from residual values of vehicles sold by the partnership when lessees failed to exercise their purchase options, the partnership would realize a slight profit on the mark-up of vehicles through the financing arranged on the leases. Mr. Berenson's assumptions as to the percentages of purchase options that would not be exercised and residual values of such automobiles, as well as the various lease fees to be paid to Circle and the general partner, were reviewed for purposes of the trial by petitioners' expert witness, Barry P. Korn. Mr. Korn is a chartered financial analyst with bachelor of business administration -- public accounting and master of business administration degrees from City University *593 of New York. His experience included work as a securities analyst and investment counselor for an investment banking firm. At the time of trial, Mr. Korn had been directly engaged in equipment and vehicle leasing for 20 years, including 9 years in the leasing of automobiles. Mr. Korn's report reflects his opinion based upon his experience in the vehicle leasing industry and reputable sources he relied on with respect to assumptions of Mr. Berenson in his projections. Mr. Korn was of the opinion that the following assumptions of Mr. Berenson, which were employed by Term Leasing Associates in its leasing activity, were reasonable and consistent with industry standards and averages: (1) Leases having terms of 36 months with two initial payments required of the lessee; (2) A straight-line write-off of interest; (3) An option purchase price of 35 percent of the original cost of the vehicle, equal to the balloon payment due on the vehicle; (4) The 15 percent mark-up charged the lessee in the financing of the vehicle; (5) That approximately 50 percent of lessees would not exercise the purchase option at the end of the lease (exclusive of terminated leases where the purchase option *594 is forfeited); (6) That approximately 25 percent of lessees would default during the term of the lease and forfeit the purchase option; (7) That the residual value of a vehicle at the end of a 36-month lease term would equal approximately 50 percent of the original cost of the vehicle; (8) The base lease fee of 3.5 percent and the lease fee of 7 percent to the agent. [2]
Mr. Korn expressed no opinion on the management fees paid to the general partner and the sharing ratio of residual proceeds. His opinion was that such fees, based on performance, were reasonable in concept but that the amounts of such fees were negotiable and varied in structure in different leasing programs. The 1982 renegotiated agreements required Circle, as agent, to purchase and lease automobiles with an aggregate cost of $ 4 million per year *595 and increased the capital contributions of the limited partners to $ 1,100,000. Petitioners paid the increased capital amount. Petitioners also agreed to an increase in the "overcall" provision for additional capital contributions to $ 6 million for payment of partnership liabilities. The renegotiated agreements reduced the administrative fees payable to the general partner, and the percentage of profits on residuals payable to Circle, with a corresponding increase in the percentage of residual values to be retained by the partnership. The provision for liquidated damages in the event Circle failed to purchase the requisite number of vehicles was also renegotiated. Mr. Brauser and Term Industries, Inc., executed another guarantee of Circle's performance under the agency agreement. All of the financing for vehicles purchased and leased by the partnership was provided by two financial institutions, Tilden Commercial Alliance (Tilden) and Bankers Trust Co. and its successor, Fleet Credit Corp. (Bankers Trust/Fleet). Generally, leased vehicles were titled in the name of, and registered in the name of, the partnership or the lessee, [3] with the lender named as lienholder on the *596 title. These policies, however, were not followed with precision. At the end of a lease, if the lessee did not exercise the purchase option, the partnership could sell or re-lease the vehicle after the partnership paid the balloon. Sometime in August 1982, a Master Lease Agreement (the master lease) was entered into by Term Leasing Associates as lessor and Term Industries, Inc., as lessee, which provided, in effect, that all automobiles involved in the leasing activity would first be leased by Term Leasing Associates to Term Industries, Inc., and then Term Industries, Inc., would enter into individual leases with customers or end users. The terms for the automobiles leased in the master *597 lease were coterminus with the terms of the leases entered into with the end users. Under the master lease, Term Industries, Inc., agreed to pay as rental for each automobile a fixed rental equal to 107 percent of the monthly payments made by the end user and a percentage rental equal to 10 percent of the excess of the rent received by the sublessor from its sublessee over the amount due the bank, the option price of the automobile, and 15 percent of the original cost of the automobile. The master lease was executed by Term Industries, Inc., in its capacity as general partner of Term Leasing Associates, and Term Industries, Inc., as lessee. Mr. Brauser signed in his capacity as president of Term Industries, Inc. Petitioners were not parties to the agreement. At trial, all of the witnesses who were knowledgeable of Term Leasing Associates' activities testified that the terms of the master lease were never implemented or adhered to. The books and records of the partnership did not reflect any income or expenses based upon the master lease. Mr. Brauser admitted executing the document but testified that the master lease was not carried out, and the partnership's leasing activity *598 was conducted by the partnership solely through the agency agreement with Circle without Term Industries, Inc., as an intermediary lessee, sublessor. The concept of the master lease was never discussed or negotiated by petitioners with Mr. Brauser, and no reference is made to such an agreement in the partnership agreement, although the partnership agreement specifically recognizes the agency agreement with Circle. The concept of the master lease, with Term Industries, Inc., as an intermediary lessee, does not mesh or dovetail with the agency agreement nor was the purpose for the master lease established at trial. No documents or agreements were ever executed to account for the agent's role in the leasing activity in the context of the master lease; nor was any provision or agreement made as to how the intermediate lessee would affect the general partner's entitlement to management fees and sharing in the residuals of automobiles taken over by the partnership. The master lease appears to contravene in a substantial way the manner in which the partnership was to conduct its business as set out in the partnership and agency agreements. Under the partnership agreement, the general *599 partner had no authority to do any act in contravention of the agreement. Any amendment to the partnership agreement required the written consent of all partners. Since the concept of the master lease was totally foreign to the transaction as it was represented and agreed to by petitioners; since petitioners never executed any documents consenting to the master lease; and, since the terms of the master lease were never adhered to, nor its purposes established, the Court regards the master lease as a nullity. Certain provisions of the original 1981 partnership agreement which were not modified in the January 1, 1982 revision were: (1) The limited partners would not be personally liable for partnership obligations in excess of their initial capital contributions and the overcall amounts; (2) the partners were personally liable for overcall amounts; (3) the general partner would incur no partnership indebtedness unless the lender agreed that it would exhaust all other remedies first before seeking relief against the partnership or its limited partners; and (4) any creditor of the partnership, including the general partner or its affiliates, could proceed directly against the partners *600 for payment of any indebtedness of the partnership which the partnership failed to pay. The parties agreed in a separate document that the requirement to contribute additional capital under the overcall provision would not include obligations of the partnership for fees and amounts owed to the agent, Circle. Mr. Brauser and Term Industries, Inc., executed unlimited guarantees to the two lending institutions for all loans financing automobiles leased by the partnership. By letter dated June 5, 1981, Tilden agreed in the event of the partnership's default that Tilden would look first to the partnership, next to the collateral, third to the limited partners up to $ 50,000 in the aggregate, fourth to the lessees, and, finally, to the limited partners "up to the amount of their respective unpaid commitments". Bankers Trust/Fleet did not agree to so limit its recovery methods. The partnership information returns reflect the following profits and losses: Year
Profit/(Loss)
1981
$ (  514,002)
1982
(2,119,707)
1983
(2,675,744)
1984
(2,259,153)
1985
1,802,782, $ 1,224,052,
or $ 381,166 [1]
1986
(588,637)
1987
508,964
*601 The partnership return for 1982 reflected liabilities and capital as of the end of the taxable year as follows: Accounts payable
$   254,293 Mortgages, notes, and bonds payable
in less than 1 year
2,781,831 Other current liabilities
4,207,569 All nonrecourse notes
--    Mortgages, notes, and bonds payable
in more than 1 year
--    Other liabilities
--    Partners' capital accounts
(1,518,341)
Total liabilities and capital
$ 5,725,352 The "Other current liabilities" were identified as follows: Agent fees payable
$   554,534
Due to general partner
172,808
Deposit payable
--   Accrued expenses
78,500
Due to agent -- car purchases
3,401,727
Total other current
$ 4,207,569
liabilities
The $ 2,119,707 loss reported by the partnership for 1982 was based upon the following income and expenses: Schedule 4797 ordinary gain from sales of assets used in a trade or business
$     6,376 Schedule C, Trade or Business Income:
Gross rents
$   814,873
Less expenses:
Depreciation
$ 1,728,280
Interest
695,483
Legal & accounting
5,593
Fee to general
90,000
partner
Referral fees
5,892
Sundry
282
Administrative
300,000
Leasing fee
115,426
$ 2,940,956
Loss -- Schedule C
(2,126,083)
Total reported loss
($ 2,119,707)
*602 Since most of the profit petitioners expected from their investment was based upon the residual values of automobiles after leases expired or terminated, they did not expect any return on their investment for at least 3 years. The agreements called for Circle to periodically certify the number of cars bought and leased on behalf of the partnership. This was not done on a regular basis; however, petitioners did not actively seek additional information about the partnership income until 1984. During this time, Mr. Henkind visited the business premises and maintained contact with Mr. Brauser. Mr. Henkind was satisfied that the leasing activity was being conducted in accordance with their agreement and did not complain to Mr. Brauser of any problems with the manner and level of leasing activity. Sometime in 1984, however, petitioners felt that profit distributions should have been forthcoming, and, when none came, they requested an accounting from Mr. Brauser. When such information was not provided, they arranged to have an accountant review the books and records of the partnership. After the books and records were reviewed, the accountant concluded that the partnership had realized *603 a minimum of $ 800,000 in residual values from closed leases, of which petitioners should have been entitled to receive approximately two-thirds. Mr. Brauser did not dispute the accountant's findings; however, payments were never made to petitioners. Petitioners then engaged an attorney who filed an action in State court and another action in Federal court seeking an accounting and recovery of the profits due them. These two cases were pending at the trial of this case. The economics of the automobile leasing industry changed significantly after the initial years of the partnership. Residual values of automobiles declined sharply from the levels experienced in prior years. This came about because inflation and interest rates subsided. In addition, automobile manufacturers began offering financing for new cars at interest rates substantially lower than commercial rates. This resulted in an increase in the market for new automobiles with a corresponding depression in the used car market. More lessees failed to exercise their purchase options and, in many cases, the residual values were less than the balloon payments due the bank. As a result, the partnership defaulted on bank *604 loans when balloon payments came due and was unable to realize any profit on those automobiles in which the balloon payments were made because the values were less than the balloon. Term Industries, Inc., ultimately filed for protection under chapter 11 of the bankruptcy law following the filing of a petition for involuntary bankruptcy by creditors (other than the banks financing the partnership's automobiles). Term Industries, Inc., as general partner, in accordance with the provisions of the partnership agreement, on June 23, 1989, requested that additional capital be contributed by the limited partners in the amounts of $ 1,042,598.80 by Mr. Henkind and $ 115,844.31 by Mr. Simpson. Petitioners did not pay these amounts because of their pending actions against Mr. Brauser, Circle, and Term Industries, Inc. In these actions, Mr. Brauser, Circle, and Term Industries, Inc., filed counterclaims against petitioners for the additional capital contributions under the overcall provisions of the partnership agreement. At the time petitioners entered into the agreement with Mr. Brauser and Term Industries, Inc., petitioners were aware that Mr. Brauser and his affiliates were already *605 engaged in automobile leasing activities not only for themselves but for other investors as well. These activities continued after petitioners became partners in Term Leasing Associates. In the partnership agreement, petitioners recognized these activities and agreed that, even though such activities by Mr. Brauser and his affiliates might create a conflict of interest with petitioners, Mr. Brauser and his affiliates were not precluded from continuing these activities for themselves and others. While the record indicates that problems did arise in connection with the leasing activities of petitioners and these other interests in regard to the proper registration and titling of cars, it appears that the books and records of Term Leasing Associates accounted for the income and expenses attributable to the cars owned and leased by the partnership. The Court finds that the leasing activities for Term Leasing Associates were accounted for in the books and records irrespective of commingling and other problems which arose with the leasing activities conducted by Mr. Brauser for himself and others. The independent accounting which petitioners procured, and in which it was determined *606 petitioners were entitled to distributions from residuals, resolved accounting errors which might have previously existed. Mr. Brauser did not dispute the general conclusions of petitioners' accountant. The Federal and State court actions were filed by petitioners on June 11, 1987, against Mr. Brauser, Circle, and Term Industries, Inc., charging them with securities fraud, violation of the Racketeer Influenced & Corrupt Organizations Act (the RICO statute), breach of contract, tortious interference with contractual relations, breach of guaranty, and breach of fiduciary duty. Based on a motion to dismiss filed by Mr. Brauser and his codefendants, the Federal District Court dismissed petitioners' cause of action under the RICO statute because the 4-year period of limitations for a RICO cause of action had run. At a hearing, the District Court found that petitioners knew by the spring of 1983 of Mr. Brauser's alleged fraudulent conduct, and, since more than 4 years had elapsed before petitioners' suit was filed, their claim for relief under the RICO statute was barred. The court made no determinations or findings of fact with respect to the relief sought by petitioners in the other *607 causes of action. That action was pending at the time this case was heard. OPINION In amended answers, respondent alleged that petitioners are collaterally estopped from denying that they had knowledge of Mr. Brauser's alleged fraudulent conduct with respect to the operation of Term Leasing Associates by the spring of 1983, and that, since Mr. Brauser's alleged fraudulent activities occurred during 1982, petitioners, as reasonable investors, knew that the partnership agreements had been breached and that such breaches constituted a basis for terminating the agreements. On brief, respondent argues that some of the positions taken by petitioners in the Federal and State court cases are contrary to positions taken before this Court, particularly with regard to their investigations of the automobile leasing business prior to entering into the agreements; the percentages of lessees who would not exercise the lease purchase options; whether the master lease went into effect; and whether Mr. Brauser conducted the partnership with a profit objective. The burden of proof on this issue is on respondent. Rule 142(a). In order to meet this burden with respect to the plea of collateral *608 estoppel, respondent must prove that the issues in this case have previously been presented and determined by a court of competent jurisdiction, and that there has been no subsequent modification of the significant facts, nor a change or development in the controlling legal principles which might make the prior determination obsolete or erroneous, at least for future purposes. Lea, Inc. v. Commissioner, 69 T.C. 762, 765 (1978). Collateral estoppel is a judicial tool designed to avoid repetitious litigation of legal issues involving the same party or his privy and to put the limited resource of judicial time to its best economic use. Jaggard v. Commissioner, 76 T.C. 222, 223 (1981). The doctrine, however, "must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged." Commissioner v. Sunnen, 333 U.S. 591, 599-600 (1948). In the event the second proceeding involves some issues which were decided in the first proceeding, and some which *609 were not, collateral estoppel only applies to those issues which were previously determined. Jaggard v. Commissioner, supra at 224. The only factual issue determined in the Federal proceeding filed by petitioners is that petitioners knew of the alleged fraud perpetrated by Mr. Brauser by the spring of 1983. That factual determination is the basis upon which the Federal court determined that petitioners could not recover or seek relief under the RICO statute. That finding was not a finding or determination that petitioners sustained or did not sustain a loss for the year 1982, or what petitioners' tax liabilities might be, if any, for 1982 as a result of Mr. Brauser's alleged fraudulent activities, or that petitioners were a party to the fraud. In other words, the issues before this Court were not actually raised and litigated in the Federal proceeding. The requirement under the law of collateral estoppel that an issue be actually litigated is generally satisfied if the parties to the original action disputed the issue and the finder of fact resolved it. Vallone v. Commissioner, 88 T.C. 794, 805 (1987). Moreover, *610 petitioners have alleged several other causes of action in their suit against Mr. Brauser, Circle, and Term Industries, Inc., including Federal securities violations, breaches of contract, breach of fiduciary duties, and recovery for amounts due in the operation of the leasing activity. None of the facts relating to these causes of action have been decided, including the positions which respondent contends are inconsistent with positions in this case. Even if petitioners are bound in this Court with having had knowledge of Mr. Brauser's alleged fraud in the spring of 1983, respondent has not established how that knowledge precludes petitioners from litigating their tax liability for 1982 arising out of their contractual relationship with the party who perpetrated the fraud against them. The Court holds that the burden of proof has not been sustained by respondent, and petitioners are not collaterally estopped by the pending actions against Mr. Brauser and other parties in the Federal and State courts from contesting the issues which respondent's deficiency determination gives rise to. The primary question is whether petitioners are entitled to deduct their distributive share of *611 partnership losses for taxable year 1982. Respondent contends that petitioners are not so entitled because (1) the partnership did not acquire the benefits and burdens of ownership of the automobiles, (2) petitioners did not make a true economic investment in the partnership, and/or (3) the partnership did not enter into and carry on the leasing activity with an actual and honest profit objective. Alternatively, respondent argues that petitioners' deductions are limited under section 465 to the capital contributions petitioners made to the partnership, and that petitioners are not at risk for contingent capital contributions provided for in the overcall provision of the partnership agreement. Respondent also determined that petitioners are liable for the addition to tax under section 6661 and increased interest under section 6621(c). The issue, as framed, is based upon respondent's disallowance of the entire loss of $ 2,119,707 reported by Term Leasing Associates on its 1982 information return. [4] In the statements accompanying the notices of deficiency, respondent's basis for disallowing the partnership's loss is explained as follows: I. All items of income, loss, and deduction *612 reported with respect to Term Leasing Associates partnership for the year 1982 are disallowed. For purposes of federal income taxation the partnership cannot be considered the owner of the automobiles with respect to which said items of income, loss and deduction are reported since, after examination of all the facts and circumstances, the partnership has been found not to have incurred the benefits and burdens of ownership of the automobiles or to have made, in substance, a true economic investment in the automobiles. Alternatively, if it is held that the partnership is the owner of the automobiles for federal income tax purposes during the year at issue, then it is determined that the partnership's acquisition and leasing of the automobiles was not an activity entered into for profit. Accordingly, the partnership loss is not allowable pursuant to I.R.C. Section 162 and 183. II. Your amount at risk under section 465 is limited to your capital contribution actually made to the partnership. Your amounts at risk cannot be increased by your agreement to make an additional capital contribution until such time as the contribution is actually made. Accordingly, such amount is deemed *613 not at risk or contingent. Furthermore, based upon all the facts and circumstances you are protected against any risk of loss beyond the amount of capital already contributed. Respondent's argument, as set forth in the notices of deficiency, that the partnership did not acquire the benefits and burdens of ownership is misdirected. It is based upon respondent's contention that some of the leases were not true leases *614 but rather were sales or financing transactions. Accordingly, the purported lessees of the vehicles were the owners, and the partnership had no ownership interests in the leased vehicles. Even if respondent is correct in this argument, which involved situations where the purported lessee could purchase the automobile for a nominal sum at the expiration of the lease, that fact would not negate the partnership's being engaged in a trade or business activity. If the leasing transactions were sales or financing transactions rather than leases, the transactions would nevertheless generate either income or loss, although the nature of the income and expenses generating such gain or loss might be different. A new car dealer on Main Street, U.S.A., is just as much engaged in a trade or business as the car rental agency at the local airport, even though the nature of the income and expenses of the two are materially different. Respondent made no attempt to recast the partnership's income or loss on those transactions which may have been sales. Respondent erred, therefore, in disallowing the losses reported by the partnership solely on the basis that the partnership did not enjoy the *615 benefits and burdens of ownership because the purported leases were sales or financing transactions. Moreover, the record does not support respondent's argument that all or a substantial portion of the partnership's leases were sales transactions. Most of the partnership's leases provided a purchase option to the lessee for the amount of the balloon payment due on the automobile at the end of the lease. The evidence supports a finding that the partnership was engaged in an activity that could generate income or loss. This aspect of respondent's argument is rejected. It was established, however, that Term Industries, Inc., Mr. Brauser, and his affiliates were engaged in the automobile leasing business for themselves and other interests at the time the agreement was entered into with petitioners. In the partnership agreement, petitioners, as limited partners, recognized this fact and further recognized that these other activities of Mr. Brauser and his affiliates might conflict with the leasing activities of the partnership. The record shows that there were indeed some conflicts which developed in that some automobiles were not properly accounted for in the books and records of *616 the various entities, and some automobiles were not properly titled and registered. Ostensibly, because of these problems, respondent perceived that the entire operation was so loosely operated by Mr. Brauser and commingled with the interests of himself and other clients that the partnership did not bear the benefits and burdens of ownership of any identifiable property, and, therefore, the partnership was not engaged in a trade or business. The partnership purchased specifically identified vehicles, loans were made to finance these vehicles, and leases were drawn with unrelated customers and assigned to financial institutions, with recourse to the partnership. The partnership remained liable on the loans and, when leases terminated or the lessees failed to exercise the purchase options, the partnership was liable for the balances due on the loans financing the automobiles. Notwithstanding the fact that there was some commingling of interests, the record does not support a finding that the operations of Mr. Brauser were so loosely conducted that the partnership was not engaged in a trade or business. Whatever conflicts or problems existed in connection with the other interests *617 of Mr. Brauser were resolved to the satisfaction of petitioners when the independent accountant retained by petitioners reviewed the books and determined the amounts petitioners were entitled to. The accountant did not find that the business was so loosely operated by Mr. Brauser and commingled with that of his other clients that the operations attributable to Term Leasing Associates could not be determined or ascertained. The Court is satisfied that the partnership's trade or business existed, and that its interests were separate and identifiable from the others Mr. Brauser represented. This aspect of respondent's argument is also rejected. The record does not support respondent's argument that petitioners did not make a true economic investment in the partnership. Petitioners made cash capital contributions to the partnership totaling $ 1,100,000. There were extensive arm's-length negotiations between petitioners, Mr. Brauser, and their respective attorneys. Petitioners carefully reviewed the economics of the automobile leasing business and satisfied themselves of the risks and possibilities for profit. Mr. Brauser and his affiliates possessed financial strength and had *618 been engaged in the automobile leasing business for years. The Court concludes that petitioners made a true economic investment in the partnership. Respondent determined that the partnership's automobile leasing activity was not engaged in for profit. Section 183(a) provides generally that, if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed. However, section 183(b)(1) provides that deductions which would be allowable without regard to whether such activity is engaged in for profit shall be allowed, and section 183(b)(2) provides that deductions which would be allowable only if such activity were engaged in for profit shall be allowed "only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." In determining whether an investment by an individual in a limited partnership constitutes an activity for profit within the meaning of section 183, the issue must be determined at the partnership level based on the activities of the partnership. Hager v. Commissioner, 76 T.C. 759, 781-783 (1981); see Brannen v. Commissioner, 78 T.C. 471, 501-505 (1982), *619 affd. 722 F.2d 695 (11th Cir. 1984). Thus, if a limited partnership is engaged in an activity for profit within the meaning of section 183, its limited partners are likewise engaged in an activity for profit, and deductions attributable to their investment in the partnership are not subject to the limitations of section 183. Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." The standard for determining whether the expenses of an activity are deductible under either section 162 or section 212(1) or (2) is whether the taxpayer engaged in the activity with the "actual and honest objective of making a profit". Ronnen v. Commissioner, 90 T.C. 74, 91 (1988). While a reasonable expectation of profit is not required, the taxpayer's profit objective must be bona fide. Hulter v. Commissioner, 91 T.C. 371 (1988). Whether a taxpayer had an actual and honest profit objective is a question of fact to be resolved from all relevant *620 facts and circumstances. Hulter v. Commissioner, supra at 393; Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). The burden of proving such objective is on petitioner. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). In resolving this factual question, greater weight is given to objective facts than to the taxpayer's after-the-fact statements of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Siegel v. Commissioner, 78 T.C. 659, 699 (1982); sec. 1.183-(2)(a), Income Tax Regs.
Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of nine objective factors relevant to the determination of whether an activity is engaged in for profit. These factors are (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; *621 (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits earned, if any; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation involved in the activity. These factors are not merely a counting device where the number of factors for or against the taxpayer is determinative, but rather all facts and circumstances must be taken into account and more weight may be given to some factors than to others. Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Not all factors are applicable in every case, and no one factor is controlling. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); sec. 1.183-2(b), Income Tax Regs.
Petitioners investigated the profit potential of vehicle leasing before entering into the partnership and, through Mr. Berenson, made further investigation before expanding the activity in *622 1982. Petitioners' expert witness concluded that the projections of profit potential made by Mr. Berenson were based on reasonable assumptions. The Court accepts the expert's conclusion. Respondent presented no evidence to the contrary. The vehicle leasing business was operated in a businesslike manner on a full-time basis. Mr. Brauser, who had substantial net worth, and the general partner, Term Industries, Inc., had extensive experience in the automobile leasing industry prior to entering into the partnership. At the time petitioners entered into the activity, economic conditions favored the leasing industry and, in particular, automobiles. The partnership expected losses in the early years but expected profits from the sale or re-leasing of vehicles in later years, when residual values of used cars would be realized. Although the economic trends changed in later years, and petitioners, unfortunately, faced mismanagement and other problems with Mr. Brauser, those situations were not of their making and could not be contemplated at the time petitioners made their investments. Upon consideration of all the facts and circumstances, the ultimate question is whether the partnership *623 had an actual and honest objective of making a profit from automobile leasing. On this record, the Court concludes that petitioners established that the automobile leasing activity was carried on by the partnership with the actual and honest objective of making a profit. Accordingly, this issue is decided in favor of petitioners. Respondent's next contention is that petitioners were not "at risk" within the meaning of section 465 for any amount in excess of their cash contributions to the partnership. Section 465(a)(1) permits deduction of losses attributable to an activity to which the section applies only to the extent the taxpayer is "at risk" for the activity at the end of the taxable year. Leasing section 1245 property, as defined in section 1245(a)(3), is an activity to which section 465 applies. Sec. 465(c)(1)(C). A taxpayer is considered to be at risk for the amount of cash contributed and amounts borrowed for the activity. Sec. 465(b)(1)(A) and (B). With respect to borrowed funds, the amounts must have been borrowed for use in the activity, and the taxpayer must be personally liable for repayment of such amounts or have pledged property other than property used in *624 the activity as security for such borrowed amount. Sec. 465(b)(2)(A) and (B). The taxpayer is not at risk for "amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Sec. 465(b)(4). The deductions claimed by petitioners exceeded the cash they invested in the partnership. That brings forth the question whether petitioners were at risk for "amounts borrowed" under section 465(b)(1)(B) as defined in section 465(b)(2) to enable them to deduct the entire amount of the loss claimed. Petitioners contend that, under the overcall provision of their partnership agreement, the amounts the general partner could call upon them as additional capital contributions for payment of partnership liabilities constituted "amounts borrowed" under section 465(b)(1)(B) and (2), and, therefore, petitioners being ultimately liable for payment of partnership debts, accordingly, were at risk for amounts sufficient to allow the deductions claimed by them arising from their partnership investment. Petitioners point out that the overcall provision was effectuated when the partnership defaulted on its liabilities owing to, among others, *625 Fleet, one of the two financial institutions which had financed the partnership's leasing activities, and that Fleet made demand upon the partnership for payment of the indebtedness and, pursuant thereto, the general partner made the call to Mr. Henkind and Mr. Simpson requesting, respectively, $ 1,042,598.80 and $ 115,844.31 to pay the partnership's liability then in default. The determination of a taxpayer's amount at risk is made at the end of each taxable year of the partnership or other activity. Sec. 465(a); Melvin v. Commissioner, 88 T.C. 63, 73 (1987), affd. 894 F.2d 1072 (9th Cir. 1990). The fact that the debt obligations of a partnership do not mature or do not become payable until later years does not preclude such debts from being included in the at-risk amounts of the partners who are personally liable for such debts. Melvin v. Commissioner, supra at 73-74. A partner is regarded as personally liable within the meaning of section 465(b)(2)(A) if such partner has the ultimate liability to repay the debt obligation of the partnership in the event funds from the partnership's *626 business and investments are not available for that purpose. Abramson v. Commissioner, 86 T.C. 360, 375-376 (1986); Smith v. Commissioner, 84 T.C. 889, 907-908 (1985), affd. without published opinion 805 F.2d 1073 (D.C. Cir. 1986). In determining who is ultimately liable for a partnership's obligations, the scenario that controls is the worst-case scenario, not the best case. The fact that the partnership or other partners remain in the "chain of liability" does not detract from the at-risk amount of the parties who have the ultimate liability. In determining which investors are ultimately financially responsible for the obligations, the substance of the transaction controls. Thornock v. Commissioner, 94 T.C. 439, 448 (1990); Krause v. Commissioner, 92 T.C. 1003, 1017 (1989); Melvin v. Commissioner, supra at 75. Thus, in this case, the fact that the general partner was also in the "chain of liability" as the result of guaranty agreements is not sufficient to preclude petitioners from being at *627 risk if petitioners are ultimately liable for the obligations. Similarly, Mr. Brauser's guarantees to the banks, while providing an additional source of recovery for the lenders, does not render the partnership less liable as the primary obligor on the debts. The fact that funds may be available from other sources to pay debts does not detract from the liability of the debtor of last resort to make such payment if the funds are not forthcoming. Krause v. Commissioner, supra at 1024. This Court considered section 465(b)(1)(B) and (2)(A) in determining the personal liability of limited partners under a partnership agreement calling for contribution of additional capital to pay a certain recourse partnership note in Pritchett v. Commissioner, 85 T.C. 580 (1985), revd. and remanded 827 F.2d 644 (9th Cir. 1987). In the Pritchett case, a limited partnership executed a recourse note in connection with a turnkey drilling agreement. Only the general partners were personally liable on the note. In addition to their initial cash capital contributions, the limited partners agreed that, in the *628 event the partnership recourse note was not paid at maturity, the limited partners would make additional cash capital contributions if called upon to do so by the general partners. This Court held that the capital call provision in the partnership agreement did not render the limited partners at risk for the partnership note for the reason that: such a requirement was merely a contingency since it was not known in 1976 or 1977 (a) whether there would or would not be sufficient partnership revenues to satisfy the Fairfield note prior to or on maturity of the note, or in the event the Fairfield note was not satisfied in full on maturity, the amount of the capital contributions needed to cover the deficiency, or (b) if the general partners would in fact exercise their discretion to make the cash call if an unpaid balance on the Fairfield note were to exist on December 31, 1992. Hence, as of the close of the taxable year in issue, petitioners had no current ascertainable liability to their partnerships for future contributions. [Fn. refs. omitted.] Pritchett v. Commissioner, supra at 588. The Court of Appeals for the Ninth Circuit concluded that *629 the liability of the limited partners in the Pritchett case was not contingent because (1) the contract provisions were mandatory and economic reality dictated that the general partners would make the cash call if the note was not paid by the partnership at or before maturity, and (2) the fact that the obligation might not become due for several years was of no significance to the allocation of a pro rata share of the taxpayers' debt to the tax year in question. Pritchett v. Commissioner, 827 F.2d 644, 647 (1987), revg. and remanding 85 T.C. 580 (1985). In subsequent cases, this Court has considered whether limited partners were at risk under section 465 where the liability of the limited partners did not hinge upon an agreement to contribute additional capital but was based upon guarantees or assumptions by the limited partners of partnership liabilities. In Abramson v. Commissioner, supra, the limited partnership executed a nonnegotiable, nonrecourse note in the amount of $ 1,525,000, payable in 10 years, as part payment for a movie. The limited partners, in addition to their cash capital contributions, executed *630 a guarantee in which each partner guaranteed a proportionate part of the $ 1,525,000 nonrecourse note. This Court held that the limited partners were at risk under section 465 for the proportionate part of the note guaranteed by each partner, reasoning that: each partner is personally and directly liable for a pro rata part of the amount owed to the seller of the film, which had no interest in the activity of the partnership other than as a creditor. Because each partner's liability for the partnership debt (in the words of the statute, for the "amounts borrowed") ran directly to the seller and each partner's liability was personal, each partner is at risk for his proportionate share of amount owed to the seller. Abramson v. Commissioner, supra at 376. In Follender v. Commissioner, 89 T.C. 943 (1987), a limited partnership executed a note payable in 10 years which was recourse as to principal but nonrecourse as to interest. The limited partners executed assumptions of liability for the principal of the note but not as to the interest. Respondent agreed that the amounts assumed by each limited partner constituted the creation of a direct *631 liability and was, therefore, an "amount borrowed" for purposes of section 465(b)(1)(B). Follender v. Commissioner, supra at 950. The only question respondent raised was whether the amount borrowed should be reduced to present value because the assumption was only as to principal and not as to interest. This Court dismissed that argument as well as another argument that the difference between the amount of the debt assumed by each partner, payable 10 years later, and the present value of that obligation, 10 years earlier, represented an amount protected against loss under section 465(b)(4). The entire amounts assumed by the limited partners were held to be at risk for purposes of section 465. [5]
*632 In Melvin v. Commissioner, 88 T.C. 63 (1987), affd. 894 F.2d 1072 (9th Cir. 1990), the taxpayer was a general partner in a partnership, Medici. Medici then became a limited partner in ACG. Medici's capital contribution to ACG consisted of cash and a recourse note. ACG then borrowed money, which was represented by a recourse note, and a pledge of all of the recourse notes ACG had received from the limited partners. In determining whether the taxpayer was personally liable on ACG's bank loan by virtue of the taxpayer's liability as a general partner of Medici on the Medici note pledged to the bank, the Court distinguished the Pritchett case: In Pritchett, limited partners made initial cash contributions to a partnership and agreed to make additional cash contributions in later years if called upon to do so by the general partners in order to repay a recourse loan extended to the partnership. We determined in Pritchett that the limited partners were not at risk with respect to their contingent cash call obligations. The loan did not accrue interest and no payments of principal were due on the loan for 15 years. *633 See sec. 465(b)(3). In sum, the alleged recourse debt obligations of the limited partners to make additional cash contributions were not definite and fixed and were tainted by the non-arm's-length nature of the underlying partnership loan. In the instant case, the limited partners' obligations to make additional capital contributions to ACG were definite and fixed, and ACG negotiated the bank loan at arm's length. Although Medici's note to ACG was not payable in 1979, the year in issue, it does not follow that Medici lacked personal liability on the bank loan in 1979. Melvin v. Commissioner, supra at 74 (fn. ref. omitted). Recently in Callahan v. Commissioner, 98 T.C. 276, 282-283 (1992), appealable to the Seventh Circuit, this Court distinguished the Ninth Circuit's holding in the Pritchett case, noting that, even if the facts were not distinguishable, the Court would not be bound by the Ninth Circuit's opinion under Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). The limited partnership agreement in the Callahan *634 case contained an overcall provision for additional capital contributions by the limited partners when called by the general partner for purposes of paying or satisfying liabilities or expenses of the partnership to the extent that such expenses and liabilities could not be paid by the partnership. The overcall provision, however, contained the following proviso: Subject to the rights of creditors of the Partnership and provided the assets of the Partnership exceed the expenses and liabilities for which a New Capital Contribution may be required, a Partner may, at any time, elect by written notice to reduce the amount by which he is required to make New Capital Contribution. This Court held that, because of the above proviso, the limited partner's liability was more contingent than the promise to pay in the Pritchett case because the limited partners in the Callahan case had the right to waive or elect out of the overcall provision. Accordingly, this Court held that the limited partners were not at risk. Here, the underlying partnership debts to be paid through additional capital contributions were loans negotiated by the partnership at arm's length with unrelated financial *635 institutions. Thus, the underlying debt was not tainted by "the non-arm's-length nature of the underlying partnership loan" as was the debt in the Pritchett case. Melvin v. Commissioner, 88 T.C. 63, 74 (1987) (fn. ref. omitted), affd. 894 F.2d 1072 (9th Cir. 1990). Further, the bank loans in this case were personally guaranteed by Mr. Brauser, who, as majority shareholder of the general partner, had every incentive to cause the general partner to call for additional capital contributions from petitioners if the partnership was unable to pay its debts. This fact reduces the possibility that the general partner would exercise any discretion to forego issuing a call for additional capital contributions, one of the factors deemed by this Court in the Pritchett case to render the taxpayer's obligation contingent. Here, the general partner in fact called upon petitioners to make additional capital contributions pursuant to the overcall provision. There is no provision in the partnership agreement which would have allowed petitioners to unilaterally reduce their obligation to make the additional capital contributions *636 or to elect out of the overcall provision, as was the case in Callahan v. Commissioner, supra.
The remaining question in determining whether petitioners had personal liability for the obligation to make additional capital contributions is whether their obligation was "definite and fixed" and thus distinguishable from the obligation in the Pritchett case. See Follender v. Commission, 89 T.C. 943 (1987); Melvin v. Commissioner, supra. In the Melvin case, the taxpayers' obligation arose from a specific recourse promissory note to the partnership which was assigned to the lender as collateral for a partnership debt. In the Follender case, the taxpayer had direct liability to the lender under an assumption agreement whereby the taxpayer agreed to be liable for a portion of a partnership note. Although the liability of petitioners in this case is to the partnership for additional capital contributions, the partnership agreement specifically provides that creditors of the partnership may proceed against the partners directly to collect partnership debts, a feature apparently *637 not found in the Pritchett case partnership agreement.[6] Further, unlike the Pritchett case partnership note which bore no interest and required no principal payments for 15 years, the underlying bank loans in this case required current payments of principal and interest during the taxable year at issue and were negotiated with unrelated parties at arm's length by the partnership. The amount due the lenders by the partnership, while variable, was ascertained as of December 31, 1982. All of these facts distinguish this case from Pritchett v. Commissioner, supra, and Callahan v. Commissioner, supra.The Court, accordingly, holds that petitioners' obligations under the overcall provision of their partnership agreement were definite and fixed, so as to render petitioners personally liable and at risk under section 465(b)(2)(A). *638 Respondent next contends that any personal liability of petitioners was subject to a stop-loss agreement under section 465(b)(4) because (1) the guarantees of the general partner and Mr. Brauser to the banks constituted a stop-loss agreement, (2) the master lease executed by the parties and guaranteed by Mr. Brauser also constituted a stop-loss agreement, [7] and (3) the contractual terms of the agency agreement with Circle protected petitioners from economic loss. Respondent further asserts that the only reason the overcall provision was included in the partnership agreement was to circumvent the provisions of section 465. Initially, respondent argues that the guarantees of the general partner and Mr. Brauser of the partnership bank loans constituted a protection against loss for petitioners as contemplated by the legislative history of section 465(b)(4). *639 [8] Respondent relies upon Porreca v. Commissioner, 86 T.C. 821, 838 (1986), and American Principals Leasing Corp. v. United States, 904 F.2d 477, 483 (1990), in support of the assertion that "the structure of the transaction when considered in conjunction with the personal guarantees of Mr. Brauser effectively immunizes petitioners from any realistic possibility of suffering an economic loss, even though the underlying transaction was not profitable." In essence, respondent argues that the banks would pursue Mr. Brauser under his guarantee and collect the amounts due from him, and petitioners would thereby be insulated from the requirement that they contribute additional capital to the partnership. This reasoning is faulty because it ignores Mr. Brauser's right to seek reimbursement from petitioners for any sums he might be required to pay the banks under his guarantees. Respondent has shown no agreement between Mr. Brauser and petitioners that Mr. Brauser would not seek recovery of any amounts paid by him under his guarantees to the banks. Respondent, therefore, has not shown that such guarantees insulated petitioners *640 from liability. The guarantees of the general partner and Mr. Brauser did not constitute stop-loss agreements. Respondent next contends that the "structure of the transaction constitutes a protection against loss under section 465(b)(4)." Respondent points to the following facts in support of this contention: (1) The agency agreement required Circle to arrange 100-percent financing for automobiles prior to their purchase; (2) the leases were structured so that the lease payments from the lessee mirrored the payments due on the bank loan; (3) the residual value of each vehicle at the end of a lease was expected to at least equal the balloon payment due the bank; and (4) the payment required of the lessee to exercise the purchase option was equal to the balloon payment. The only authority cited by respondent in support of this argument is Larsen v. Commissioner, 89 T.C. 1229 (1987), affd. in part *641 and revd. in part sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990). Respondent's reliance on the Larsen case is misplaced. In the Larsen case, this Court held, and the Court of Appeals affirmed, that the taxpayer was protected from losses on nonrecourse debt assumed by the taxpayer because indemnity agreements and other contractual promises of the primary obligor which effectively limited the taxpayer's economic losses constituted "other similar arrangements" under section 465(b)(4). The record reflects no agreement in this case that would indemnify petitioners or render another party liable to reimburse petitioners for any capital contributed by them under the overcall provision. Moreover, respondent's argument that structuring leases so that the lessee's payments and remaining equity in the partnership's acquisition debt on the equipment constitutes protection against loss for the limited partners has been rejected in other equipment leasing cases. See Krause v. Commissioner, 92 T.C. 1003, 1024 (1989). Respondent's next argument is that petitioners are not at risk under section 465(b)(3) *642 because Mr. Brauser was the true ultimate obligor on the partnership bank loans and had an interest other than as a creditor. Section 465(b)(3) provides that any amount borrowed from a party who has an interest in the activity other that as a creditor, or from a related person having such an interest, shall not be considered at risk. Respondent contends that the overcall provision requires payment to such a party. This argument is not persuasive. Under the terms of the overcall provision, petitioners were only obligated to contribute additional capital to pay partnership debt borrowed from independent third party lenders, not from the general partner or Mr. Brauser. No sums were to be paid to Mr. Brauser through petitioners' overcall contributions other than possible reimbursement of payments Mr. Brauser made on partnership debts through his guarantees to the lenders. Respondent's argument that the only reason the overcall provision was included in the partnership agreement was to circumvent section 465 is not supported by the record. The record shows that Mr. Brauser insisted on the overcall provision in the negotiations with petitioners as a tradeoff for petitioners' insistence *643 that a designated dollar volume of automobiles be purchased and leased each year by the agent, Circle, and that such performance be personally guaranteed by Mr. Brauser. Mr. Brauser was of the opinion that the overcall provision would enhance the partnership's ability to finance the volume of leasing activity the partnership was required to achieve. Petitioners, therefore, were not protected from loss under section 465(b)(4) and were at risk under that section for amounts borrowed from the banks by the partnership as of December 31, 1982. The Court holds that petitioners' liability under the overcall provision is at risk under section 465(b)(3), and that petitioners were not protected against loss under section 465(b)(4). Having decided the foregoing issues in favor of petitioners, it is not necessary for the Court to consider either the addition to tax or increased interest. Decision will be entered for petitioners in docket No. 6299-89. Decision will be entered under Rule 155 in docket No. 6337-89.
Footnotes
1. All section references are to the Internal Revenue Code for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 120 percent of the interest due on the deficiency.↩
2. The fees payable to Circle in the original agreement were 7 percent and 6-1/2 percent, respectively. In the agreement renegotiated in 1982, these fees were changed to 3.5 percent and 7 percent.↩
3. Whether a vehicle was registered to the partnership or lessee depended upon which of the parties to the lease maintained insurance on the vehicle. Title to some commercial vehicles, such as limousines, was required by State law to be maintained in the name of the operator, and therefore these were titled in the name of the lessee.↩
1. Three Forms 1065, U.S. Partnership Return of Income, were submitted into evidence, with the parties disagreeing as to which Form 1065 represented the correct return for 1985. That factual question is at issue in docket No. 22161-90, Term Leasing Associates, Sol Henkind, Tax Matters Partner, and its resolution is not essential to decision of the 1982 issues presented here.↩
4. The Schedules K-1 issued by Term Leasing Associates for 1982 allocated the partnership's loss as follows: Sol Henkind
$ 1,888,659
David B. Simpson
209,851
Term Industries, Inc.
21,197
Total
$ 2,119,707
On his individual income tax return, Mr. Henkind claimed only $ 1,784,259 as a loss from Term Leasing Associates, which amount respondent disallowed in the notice of deficiency. The record does not establish why the difference of $ 104,400 was not claimed by Mr. Henkind. Mr. Simpson claimed the entire $ 209,851 loss on his 1982 return, which was also disallowed in full by respondent.↩
5. The character or nature of the liabilities of the limited partners in Abramson v. Commissioner, 84 T.C. 360 (1986), and in Follender v. Commissioner, 89 T.C. 943 (1987), was different and material to the at risk question. In the Follender case, the limited partners assumed liability on a recourse note of the partnership. As a result, the limited partners were primary obligors. In the Abramson case, the limited partners did not assume liability of the partnership's debt; however, they were nevertheless held to be primary obligors because the debt the partners guaranteed was a nonrecourse debt. Thus, as the Court pointed out, 84 T.C. at 366↩ n.10, because the debt was nonrecourse, the limited partners had no one they could turn to for reimbursement; therefore, the limited partners were primary obligors who bore the ultimate liability and, accordingly, were at risk.
6. In Pritchett v. Commissioner, 85 T.C. 580 (1985), the Court examined applicable State law (the Uniform Limited Partnership Act as adopted by California and Nevada) and concluded that such law provided that "limited partners may be named as defendants in a suit brought against the partnership by a creditor for satisfaction of a partnership debt where the limited partners are obligated to the partnership for unpaid contributions", Pritchett v. Commissioner, supra at 587, but held that "the cash call, as provided for in the certificates of limited partnership, is not an 'unpaid contribution' which would make the limited partners personally liable under the ULPA to the partnerships". Id.↩ at 588.
7. Having found that the master lease was not implemented and was of no effect, the Court need not decide whether its terms would operate as a stop-loss agreement.↩
8. S. Rept. 94-938, at 49 (1976), 1976-3 C.B. (Vol. 3) 49, 87.↩